RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0004p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────

JERONIQUE D. CUNNINGHAM,

               *Petitioner-Appellant*,

   *v.*

TIM SHOOP, Warden,

               *Respondent-Appellee*.

                               Nos. 11-3005/20-3429

─────────────

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:06-cv-00167—Patricia A. Gaughan, District Judge.

Argued:  May 12, 2021

Decided and Filed:  January 10, 2022

Before:  MOORE, KETHLEDGE, and WHITE, Circuit Judges.

─────────────

#### COUNSEL

**ARGUED:**  Michael J. Benza, LAW OFFICE OF MICHAEL J. BENZA, Chagrin Falls, Ohio, for Appellant.  Margaret Moore, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Michael J. Benza, LAW OFFICE OF MICHAEL J. BENZA, Chagrin Falls, Ohio, Karl Schwartz, WISEMAN & SCHWARTZ, LLP, Philadelphia, Pennsylvania, for Appellant.  Margaret Moore, Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

    MOORE, J., delivered the opinion of the court in which WHITE, J., joined. KETHLEDGE, J. (pp. 51–62), delivered a separate opinion concurring in the judgment in part and dissenting in part.

————————————

**OPINION**

————————————

KAREN NELSON MOORE, Circuit Judge.  Jeronique Cunningham and his half-brother Cleveland Jackson robbed and shot several friends and their family members.  A three-year-old girl, Jala Grant, and a seventeen-year-old woman, Leneshia Williams, were killed; six others were injured.  Cunningham was indicted and tried on two aggravated-murder counts, an aggravated-robbery count, and six attempted-aggravated-murder counts.  The aggravated-murder charges carried death-penalty and firearms specifications.  Cunningham and Jackson were tried separately.  The jury found Cunningham guilty on all counts and specifications and sentenced him to death.  *See State v. Cunningham* (*Cunningham II*), 824 N.E.2d 504, 510–13 (Ohio 2004).

We consider eight issues in this habeas case.  The first and second issues are juror-bias claims involving Cunningham's jury foreperson Nichole Mikesell.  Cunningham argues that Mikesell's colleagues at the county's children-services agency improperly relayed external information about Cunningham to her.  He also argues that Mikesell's relationship with the victims' families affected the jury's impartiality.  He seeks a hearing to investigate jury bias on both fronts.  Third, we consider whether Cunningham's counsel ineffectively failed to investigate and present mitigating evidence.  Fourth, we review whether Cunningham's trial counsel ineffectively failed to investigate, obtain, and present expert testimony about ballistics.  Fifth, we evaluate whether the trial court improperly restricted Cunningham's ability to question prospective jurors during voir dire.  Sixth, we decide whether the trial court failed to instruct the jury that it must determine Cunningham's personal culpability before imposing a death sentence.  Seventh, we determine whether the prosecution improperly failed to turn over witness statements to the defense.  Finally, we consider whether the prosecution made improper closing arguments during the guilt and sentencing phases.  CA6 No. 11-3005 R. 50 (7/27/11 Order at 2); R. 71 (10/13/11 Order at 1); R. 187 (7/28/20 Order at 3).

We cannot grant Cunningham relief for issues three through eight. But we conclude that Cunningham is entitled to proceed on his juror-bias claims. We therefore **REVERSE** and **REMAND** so that the district court can conduct an evidentiary hearing to investigate juror bias.

## I. ISSUES #1 & #2: JUROR BIAS

### A. Background

#### 1. Trial

Nichole Mikesell served as the jury foreperson for Cunningham's trial. R. 194-2 (Trial Tr. at 1498) (Page ID #10708). On her jury questionnaire, Mikesell indicated that she worked as a child-abuse investigator at Allen County Children Services and as a crisis counselor at Crime Victims Services. R. 192-4 (Mikesell Questionnaire) (Page ID #5301, 5306). She wrote that she worked closely with the Allen County sheriff's office, the Lima police department, and the juvenile court. *Id.* (Page ID #5302–04). To the prompt "[d]o you know of any reason you could not sit as a juror and be absolutely fair to the Defendant and the State of Ohio and render a verdict based solely upon the evidence presented you[,]" Mikesell checked "no." *Id.* (Page ID #5308). At voir dire, the judge asked the prospective jurors "do any of you have any personal knowledge of the facts of this case?" R. 194-1 (Voir Dire at 13) (Page ID #9181). Mikesell said nothing. *Id.* at 14 (Page ID #9182). The court, the prosecution, and defense counsel confirmed that Mikesell knew several of the prosecutors and a defense lawyer from work, that she worked at children services, and that she had friends "on the police department," but Mikesell assured the court that she would be impartial. *Id.* at 24–25, 37, 72, 207–09 (Page ID #9192–93, 9205, 9240, 9375–77).

The jury found Cunningham guilty on all counts and specifications and sentenced him to death. *See Cunningham II*, 824 N.E.2d at 512–13. Cunningham appealed his conviction and sentence to the Ohio Supreme Court. *See id.* at 513.

## 2. State Postconviction Proceedings

During the pendency of Cunningham's direct appeal, Jackson's investigator endeavored to interview Cunningham's jurors. The investigator secured interviews with six members of Cunningham's jury, including foreperson Mikesell and jurors Staci Freeman and Roberta Wobler, and an alternate. R. 192-4 (Investigator Rep.) (Page ID #5122). The investigator prepared a report of these seven interviews, and he swore to their veracity in an affidavit dated July 16, 2003. R. 192-4 (Ericson Aff.) (Page ID #5121). The investigator wrote—

> [Mikesell] said that there was nothing in Jeronique's life that could have possibly explained his participation in the instant offense. She said that Jeronique is an evil person. *She said that some social workers worked with Jeronique in the past and were afraid of him.* She also said that if you observe one of the veins starting to bulge in his head, watch out and stay away because he might try to kill you. She also said that Jeronique had no redeeming qualities. . . . She said that the defense knew what she did at children's services but did not ask her if she had any direct information regarding the instant offense. As it turned out, she did not have any pertinent information regarding the instant offense but said that the defense would not be aware of this.

R. 192-4 (Investigator Rep.) (Page ID #5132) (emphasis added). Freeman relayed that she voted last for finding Cunningham guilty of aggravated murder. *Id.* (Page ID #5125). "After a while," the report provides, "[Freeman] was convinced by the other jurors that Jeronique had in fact been guilty of aggravated murder as opposed to murder." *Id.*

Cunningham timely petitioned for state postconviction relief on August 1, 2003, raising a jury-bias claim based on the investigator's affidavit and report. R. 192-4 (2003 Postconviction Pet.) (Page ID #5047, 5085–91). Pointing to Mikesell's interview, Cunningham asserted that Mikesell's colleagues told her "extraneous" and "highly prejudicial information" that Mikesell had failed to divulge during voir dire or in her jury questionnaire. *Id.* (Page ID #5087). Asserting that his Sixth Amendment right to a trial by an impartial jury and his Fifth and Fourteenth Amendment due-process rights were violated, Cunningham requested a new trial or, at a minimum, discovery and an evidentiary hearing. *Id.* (Page ID #5088, 5090–91).

The state trial court denied Cunningham's postconviction petition without permitting discovery or an evidentiary hearing, and the Ohio Court of Appeals affirmed, reasoning that

> Cunningham asserted that the presence of Juror Number 21, Nichole Mikesell, on the jury was prejudicial to him and violated his rights to a fair and impartial jury. . . .
>
> The only comment made by Mikesell that would have any bearing on Cunningham's assertion is that she was provided information by some social workers regarding Cunningham. However, the investigator's interview summary of Mikesell does not indicate whether Mikesell obtained this information from the social workers prior to, during, or subsequent to Cunningham's trial. The record also does not provide when the investigator conducted these interviews with the jurors. However, the record does provide that Mikesell was thoroughly examined during the voir dire process and that she informed the court regarding the information she had about the case. Mikesell never indicated that she could not be a fair and impartial juror.

*State v. Cunningham* (*Cunningham I*), 2004 WL 2496525, at *15 (Ohio Ct. App. 2004).

The Ohio Supreme Court denied Cunningham's claims on direct appeal, *Cunningham II*, 824 N.E.2d at 532, and later declined to review Cunningham's postconviction petition, *State v. Cunningham*, 824 N.E.2d 92 (Ohio 2005).

### 3. Federal Habeas Proceedings

In 2006, Cunningham petitioned for habeas relief. He reasserted that his constitutional rights were violated by Mikesell's knowledge of extrajudicial information about Cunningham. R. 19-2 (Habeas Pet. at 7) (Page ID #243). The district court allowed Cunningham to depose the jurors, Mikesell's colleagues at Allen County Children Services, and Jackson's investigator. R. 79 (4/18/08 Mot. at 2–3) (Page ID #1501–02); R. 86 (6/9/08 Order at 10–12) (Page ID #1861–63).

Cunningham acquired affidavits from Freeman and Wobler. R. 104-1 (Freeman Aff. at 1) (Page ID #1955); R. 103-1 (Wobler Aff. at 1) (Page ID #1952). Freeman averred that during guilt-phase deliberations, Mikesell told the other jurors that she worked at the county's children-services agency. R. 104-1 (Freeman Aff. at 1) (Page ID #1955). When Freeman expressed that the ballistic evidence pointed to Jackson's—not Cunningham's—gun, Mikesell apparently

responded: "[y]ou don't understand. I know the families of the people that were shot in the kitchen. The families know me and I am going to have to go back and see them. These families are my clients." *Id.* at 1–2 (Page ID #1955–56). Freeman "interpreted Mikesell's comments as pressure to vote guilty." *Id.* at 2 (Page ID #1956). Wobler attested that "[o]ne young woman on the jury was adamant that Jeronique was not guilty. Mikesell told the young woman and the jury that the young woman did not have to work in the local community." R. 103-1 (Wobler Aff. at 1) (Page ID #1952).

Cunningham also deposed Mikesell. When pressed about her comments to Jackson's investigator, Mikesell avouched that none of her social-worker colleagues had spoken to her about Cunningham but conceded that she had read Cunningham's files posttrial. R. 188-1 (Mikesell Dep. at 13–14) (Page ID #2915–16). Mikesell claimed that she had not relayed to the other jurors any information from these records. *Id.* at 14 (Page ID #2916). The presiding magistrate judge barred Cunningham's attorney from asking Mikesell if she worked with or had communicated with the victims' families. *Id.* at 16–20 (Page ID #2916–17).

The district court permitted Cunningham to amend his habeas petition to include a second juror-bias claim based on Mikesell's knowledge and relationship with the victims' families. R. 111 (3/27/09 Mot. at 4–5) (Page ID #2036–37); R. 120 (7/21/09 Order at 5) (Page ID #2321). Denying Cunningham's request for an evidentiary hearing, the district court permitted depositions of Freeman and Wobler instead. R. 120 (7/21/09 Order at 5) (Page ID #2321). The district court explained that the necessity of an evidentiary hearing depended on the jurors' testimony. *Id.* at 6 (Page ID #2322).

Cunningham deposed Freeman and Wobler. Freeman reiterated that at guilt-phase deliberations, Mikesell told the jurors that she "dealt with the victims and their families, they knew who she was, and that if she would find him not guilty that she would have to deal with them and that's just something she didn't want to have to deal with because they knew who she was." R. 137-1 (Freeman Dep. at 6) (Page ID #2455). Mikesell's comments affected Freeman—

> I felt, I felt pressured that . . . How do I put this? I think that [Mikesell] . . . I think that other people in the room felt pressured. I was honestly the last one holding out, and I felt that I was up against a wall, and she was very domineering and so I just . . . You know I regret, I shouldn't have, but I voted guilty. . . . I mean I felt the sense in the room, I felt the pressure. She tried to steer everyone towards that.

*Id.* at 11 (Page ID #2460). Freeman did not remember whether she had told Jackson's investigator that she was "[c]onvinced by the other jurors that Jeronique had in fact been guilty of aggravated murder as opposed to murder." *Id.* at 28–29 (Page ID #2477–78). But, Freeman insisted, she had mentioned to the investigator that Mikesell spoke during deliberations about the victims' families. *Id.* at 15, 18, 19, 20 (Page ID #2464, 2467, 2468, 2469). After reading the investigator's report, however, Freeman confirmed that her remarks to Jackson's investigator were not in the report. *Id.* at 17–18 (Page ID #2466–67). Wobler likewise averred that Mikesell stated in guilt-phase deliberations that she "may in the future be working with the [victims'] families." R. 136-1 (Wobler Dep. at 5) (Page ID #2435). Wobler swore, however, that her decision was unaffected by Mikesell's comments. *Id.* at 6 (Page ID #2436).[1]

The case was subsequently assigned to a different district court, which denied Cunningham's federal habeas petition. *See Cunningham v. Hudson*, No. 3:06 CV 0167, 2010 WL 5092705, at *1 (N.D. Ohio Dec. 7, 2010). Applying 28 U.S.C. § 2254(d)(1) deference, the district court found that the *Cunningham I* court's treatment of Cunningham's initial juror-bias claim (involving Mikesell's exposure to external information about Cunningham) neither contradicted nor unreasonably applied Supreme Court precedent. *Id.* at *20. The district court further found that Cunningham's second juror-bias claim (involving Mikesell's relationship to the victims' families) was unexhausted, procedurally defaulted, and meritless. *Id.* at *21.

---

[1]Wobler could not recall having spoken to Jackson's investigator but confirmed that it was possible. R. 136-1 (Wobler Dep. at 12) (Page ID #2442).

Ohio moved to strike Freeman's and Wobler's depositions. R. 142 (3/15/10 Mot.) (Page ID #2504). The district court denied Ohio's motion. R. 155 (5/26/10 Order at 3) (Page ID #2590). To the district court, Cunningham's seeking discovery for his initial juror-bias claim in his state postconviction petition showed that Cunningham had diligently attempted to develop the facts underlying his second juror-bias claim in state court. *Id.* Accordingly, the district court reasoned, 28 U.S.C. § 2254(e)(2) permitted the court to add the depositions to the record. *Id.*

We vacated and remanded. *Cunningham v. Hudson*, 756 F.3d 477, 479 (6th Cir. 2014) (per curiam). Pointing to the Ohio courts' obscure interpretations of Ohio Rule of Criminal Procedure 33 and Ohio Revised Code § 2953.23(A)(1), we concluded that it was "at least debatable" whether Cunningham could raise his second juror-bias claim in a second state postconviction petition or a motion for a new trial. *Id.* at 485 (citation omitted). So Cunningham's failure to exhaust his second juror-bias claim did not constitute procedural default. *See id.* at 487. The district court held Cunningham's habeas petition in abeyance to allow Cunningham to exhaust his second juror-bias claim in state court. *Cunningham v. Hudson*, No. 3:06 CV 0167, 2014 WL 5341703, at *1 (N.D. Ohio Oct. 20, 2014).

**4. There and Back Again**

Back in state court, Cunningham filed a second state postconviction petition and a motion for a new trial. He raised his second juror-bias claim in both documents and requested discovery, an investigator, an evidentiary hearing, and permission to file the delayed motion. R. 188-1 (2018 Postconviction Pet. at 1) (Page ID #2828); R. 209-1 (Mot. New Trial at 1) (Page ID #11342). The Allen County Court of Common Pleas denied relief, and the Ohio Court of Appeals affirmed. The state appellate court ruled that Cunningham was not "unavoidably prevented" from discovering the facts underlying his second juror-bias claim. *State v. Cunningham* (*Cunningham III*), 65 N.E.3d 307, 312–15, 317–18 (Ohio Ct. App. May 23, 2016). The appellate court thus concluded that Ohio Revised Code Annotated § 2953.23(A) and Ohio Criminal Rule 33 barred Cunningham's new filings. *See id.* at 314–15, 317–18. The Ohio Supreme Court declined review. *State v. Cunningham*, 77 N.E.3d 987 (Ohio 2017) (Table).

Deferring to the state court's "unavoidably prevented" analysis, the district court found that Cunningham procedurally defaulted his second juror-bias claim. *See Cunningham v. Shoop*, No. 3:06 CV 167, 2019 WL 6897003, at *11–12 (N.D. Ohio Dec. 18, 2019). Cunningham appealed the district court's decision, and we granted his motion to reinstate his initial appeal. CA6 No. 11-3005 R. 187 (7/28/20 Order at 2).

**B. Analysis**

**1. Precedent**

To resolve Cunningham's juror-bias claims, we consider three canonical cases: *Remmer v. United States*, 347 U.S. 227 (1954); *Michael Williams v. Taylor*, 529 U.S. 420 (2000); and *Cullen v. Pinholster*, 563 U.S. 170 (2011).

**a. Juror Bias: *Remmer***

In *Remmer*, the Supreme Court held that a prima facie showing of juror bias—such as an allegation of "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury" in a criminal case—entitles a defendant to a hearing, awards to the defendant a presumption of prejudice, and places on the Government the burden of showing that the contact was harmless. *Remmer*, 347 U.S. at 229. The Court followed up in *Smith v. Phillips*: "This Court has long held that the remedy for allegations of juror partiality is a hearing in which the *defendant* has the opportunity to prove actual bias." 455 U.S. 209, 215 (1982) (emphasis added). Put another way, the *Phillips* Court reaffirmed *Remmer*'s core holding that a showing of juror bias demands a hearing. *See United States v. Zelinka*, 862 F.2d 92, 94–95 (6th Cir. 1988); *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998). Subsequent Supreme Court decisions that address *Remmer* hearings confirm as much. *See, e.g.*, *United States v. Olano*, 507 U.S. 725, 738–39 (1993); *Rushen v. Spain*, 464 U.S. 114, 119–20 (1983).

The courts of appeals were forced to grapple with whether *Phillips* shifted the burden of proof at a *Remmer* hearing from the Government to the defendant and whether the presumption of prejudice survived *Phillips*. Every other circuit maintains that the Government shoulders the burden at a *Remmer* hearing of showing that the alleged juror bias was harmless and has reaffirmed that defendants are awarded a presumption of prejudice at that hearing. *See* B. Samantha Helgason, *Opening Pandora's Jury Box*, 89 FORDHAM L. REV. 231, 242–43, 249–50 (2020); *Sheppard v. Bagley*, 657 F.3d 338, 350 n.1 (6th Cir. 2011) (Merritt, J., dissenting) (collecting cases). We charted our own course. In *Zelinka*, we reiterated that *Remmer* "outlined

the procedure that district courts should follow when advised of unauthorized contacts with a juror"—

> The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

*Zelinka*, 862 F.2d at 94–95 (quoting *Remmer*, 347 U.S. at 229–30). We nonetheless concluded that *Phillips* shifted the burden of showing bias at *Remmer* hearings to defendants and stripped defendants of the presumption of prejudice. *See id.* at 95–96. Notwithstanding, we still guarantee defendants a "meaningful opportunity" to demonstrate juror bias, *United States v. Lanier*, 988 F.3d 284, 295 (6th Cir. 2021) (quoting *Herndon*, 156 F.3d at 637), and maintain that bias may be actual ("bias in fact") or implied ("employ[ing] a conclusive presumption that a juror is biased" in "certain 'extreme' or 'exceptional' cases"), *Treesh v. Bagley*, 612 F.3d 424, 437 (6th Cir. 2010) (citations omitted).

### b. AEDPA: *Michael Williams* and *Pinholster*

In *Michael Williams*, the Court held that when the state courts have not adjudicated a habeas petitioner's claims on the merits and the petitioner diligently attempted to develop the facts of that claim in state courts, 28 U.S.C. § 2254(e)(2) permits federal courts to hold an evidentiary hearing for that claim. *See Michael Williams*, 529 U.S. at 437.

Michael Wayne Williams was convicted of a capital crime. *See id.* at 426. He petitioned for postconviction relief in the Virginia courts, alleging that the Commonwealth had failed to disclose its unofficial deal with one of the witnesses. *See id.* at 427. The Virginia Supreme Court dismissed the petition. *See id.* Williams sought federal habeas relief. *See id.* He reraised his undisclosed-agreement claim and set forth three new claims. Williams now alleged that Virginia violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose a pretrial psychiatric examination of the same witness. *Michael Williams*, 529 U.S. at 427. He also raised a juror-bias claim and a prosecutorial-misconduct claim. *See id.* One of Williams's jurors was formerly married to a witness for Virginia, and one of the prosecutors had represented the juror in the divorce proceedings. *See id.* at 440–41. At voir dire, when the judge asked if any of the

prospective jurors were related to the witnesses, the juror said nothing. *See id.* And when the judge asked if any of the prospective jurors had been represented by the attorneys involved in the case, both the juror and the prosecutor remained silent. *See id.* at 441.

The *Michael Williams* Court addressed whether 28 U.S.C. § 2254(e)(2) barred a federal habeas court from holding an evidentiary hearing for these four claims. *See id.* at 432. Per that provision, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the [federal habeas] court shall not hold an evidentiary hearing on the claim unless the applicant shows that" they meet both exceptions listed in § 2254(e)(2)(A) and (B). 28 U.S.C. § 2254(e)(2). The Court underscored that "failed to develop" turned on "diligence." *Michael Williams*, 529 U.S. at 432.

Because Williams diligently explored the facts underlying his juror-bias and prosecutorial-bias claims, the Court concluded that the federal courts could hold a § 2254(e)(2) evidentiary hearing for those two claims. *See id.* at 440–44. But the Court determined that Williams had not diligently developed his *Brady* claim. *See id.* at 437–38. The Court also punted Williams's failure-to-disclose claim. *See id.* at 444. Unlike the three new federal habeas claims, the Virginia Court of Appeals had rejected the failure-to-disclose claim on the merits, implicating 28 U.S.C. § 2254(d)(1)'s deferential standards of review of state courts' merits decisions. The *Michael Williams* Court therefore found it "unnecessary to reach the question whether § 2254(e)(2) would permit a hearing on th[at] claim." *Id.*

The Court addressed the relationship between § 2254(d)(1) and (e)(2) more than a decade later in *Pinholster*. There, the Court concluded that federal courts must limit their review of a state court's merits adjudication to the record before that state court. *Pinholster*, 563 U.S. at 181. Thus, federal courts cannot consider evidence yielded at federal habeas evidentiary hearings when reviewing state courts' merits decisions. *See id.* at 185–86.[2]

---

[2]The *Pinholster* Court reiterated *Michael Williams*'s analysis of § 2254(e)(2)'s application to claims that had not been adjudicated by state courts on the merits and reasoned further that *Michael Williams*'s leaving open the § 2254(d)(1) question "supported" the outcome in *Pinholster*. *See Pinholster*, 563 U.S. at 183–86.

Faithfully applying *Remmer*, *Michael Williams*, and *Pinholster*, we conclude that Cunningham is entitled to an evidentiary hearing for both his juror-bias claims.

### 2. Juror-Bias Claim #1

The *Cunningham I* court adjudicated Cunningham's first juror-bias claim—that Mikesell's social-worker colleagues fed her information about Cunningham—on the merits. Per 28 U.S.C. § 2254(d)(1) and *Pinholster*, the appropriate inquiry is whether *Cunningham I* was contrary to or unreasonably applied Supreme Court precedent based on the record before it. *See Terry Williams v. Taylor*, 529 U.S. 362, 405–11 (2000) (O'Connor, delivering majority opinion for standards governing § 2254(d)(1)'s contrary-to and unreasonable-application clauses); *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (promulgating fairminded-jurists-could-disagree standard for § 2254(d)(1) unreasonable-application inquiry); *Renico v. Lett*, 559 U.S. 766, 779 (2010) (explaining that decisions issued by courts of appeals do not constitute clearly established Supreme Court precedent for § 2254(d) purposes). So—as Ohio points out, Appellee's Br. #2 at 55—we may consider the investigator's affidavit and interview report that were presented to the state court, but we cannot include the affidavits and depositions generated during the federal habeas proceedings.

We hold that *Cunningham I* unreasonably applied *Remmer*. *Phillips* retained *Remmer*'s core holding that a prima facie showing of juror bias entitles a defendant to an evidentiary hearing. *See Phillips*, 455 U.S. at 215 ("[T]he remedy for allegations of juror partiality is a *hearing* . . . ." (emphasis added)). By attaching evidence to his state postconviction petition that raised the question whether Mikesell had spoken to her colleagues about him, Cunningham credibly alleged that a "private communication [occurred] . . . with a juror during a trial about the matter pending before the jury . . . ." *Remmer*, 347 U.S. at 229. This colorable claim of extraneous influence entitled Cunningham to a *Remmer* hearing. *See id.*; *see also Herndon*, 156 F.3d at 635 ("Where a colorable claim of extraneous influence has been raised . . . a '*Remmer* hearing' is necessary to provide the defendant with 'the opportunity to prove actual bias.'" (quoting *Phillips*, 455 U.S. at 217)); *Garcia v. Andrews*, 488 F.3d 370, 376 (6th Cir. 2007)) ("This court has defined 'an extraneous influence on a juror [as] one derived from specific knowledge about or a relationship with either the parties or their witnesses.'" (alteration in

original) (quoting *Herndon*, 156 F.3d at 635)); *Ewing v. Horton*, 914 F.3d 1027, 1030 (6th Cir. 2019) ("When a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury. In other words, where a colorable claim of extraneous influence has been raised, an evidentiary hearing must be held to afford the defendant an opportunity to establish actual bias." (cleaned up)).

The dissent notes that only our circuit precedent addressing juror bias on direct appeal uses the term "colorable claim," and as such, per § 2254(d)(1), we may not rely on it in analyzing the state court's interpretation of *Remmer*. Dissent Op. at 54. Requiring only a prima facie (i.e., colorable) claim of prejudice, however, is the only sensical interpretation of *Remmer*, which is Supreme Court precedent. *Remmer* instructed the trial court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing" based on "information such as was received in this case," but the point of that rule was to direct the district court to inquire *further* into the defendant's credible allegations. 347 U.S. at 229–30. That language cannot be reduced to a mere "data point," and cannot be reasonably interpreted, as the dissent suggests, to limit the future application of *Remmer* to its precise facts. Dissent Op. at 55.

Nor does our requisite level of deference to Ohio courts require us to accept an unreasonable application of *Remmer*'s rule solely because *Remmer* involved different allegations of outside influence. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'" (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006))). Whether the defendant alleges that a third party offered a juror a bribe, as in *Remmer*, or that a third party provided a juror with outside information she otherwise would not have known, the principle is the same: a defendant must be afforded a chance to prove the juror's bias in a *Remmer* hearing. *See Phillips*, 455 U.S. at 216 ("Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury." (quoting *Dennis v. United States*, 339 U.S. 162, 167 (1950))).

Ohio insists, and the dissent agrees, that Cunningham has not provided any evidence that Mikesell used extrajudicial information while a member of the jury. *See* Appellee's Br. #2 at 21; Dissent Op. at 55–56. But Ohio has skipped a constitutional step. In *Remmer*, the Court did not require the defendant to prove "what actually transpired, or whether the incidents that may have occurred were harmful or harmless" before receiving an evidentiary hearing. 347 U.S. at 229. Again, *Phillips* reiterated *Remmer*'s guarantee that a prima facie showing of juror bias entitles a defendant to an evidentiary hearing—"*allegations* of juror partiality" suffice. 455 U.S. at 215 (emphasis added). Per *Remmer*,—which, contrary to the dissent's interpretation, also involved a "degree of speculation"—a hearing was the appropriate forum for a trial court to decide the nature, timing, and content of any communications about Cunningham between Mikesell and her colleagues. To receive a *Remmer* hearing, Cunningham had to colorably allege that the jury encountered extraneous influence—which he did in his state postconviction petition. The state appellate court thus unreasonably dismissed Cunningham's first juror-bias claim based on the interview report.

The *Cunningham I* court erroneously homed in on Mikesell's statements during voir dire. *Cf. Cunningham I*, 2004 WL 2496525, at *15.[3] Yes, Mikesell proclaimed that she could be fair and impartial notwithstanding that she had worked with members of the police department, the prosecution, and the defense. But Mikesell's relationship with the Ohio justice system's repeat players is immaterial to whether her colleagues may have provided her with external information during trial. Nothing otherwise stated in Mikesell's jury questionnaire or during voir dire would have flagged to Cunningham's trial counsel that Mikesell might have been discussing this case with her colleagues. Indeed, Mikesell confirmed that her employment at Allen County Children Services would not affect her partiality without saying more. Her statement weighs in favor— not against—finding that Cunningham's lawyers had no notice that Mikesell or her colleagues possessed extrajudicial information about him.

---

[3]The district court similarly erred. *See Cunningham*, 2019 WL 6897003, at *20.

The *Cunningham I* court's unsound reasoning that "the record [] does not provide when the investigator conducted these interviews with the jurors" puts us at sea. *Cunningham I*, 2004 WL 2496525, at *15. Neither *Remmer* nor *Phillips* states that the timing of a defendant's allegation of an external contact erases their right to an evidentiary hearing. Indeed, the defendant in *Remmer* learned about an impermissible external contact between his jury foreperson and the FBI after his verdict came in—just like this case. *See Remmer*, 347 U.S. at 228. Citing the timing of the juror interviews to deny Cunningham any investigation into juror bias involves an unreasonable application of *Remmer*. The interviewer's affidavit, moreover, is dated July 16, 2003. R. 192-4 (Ericson Aff.) (Page ID #5121). Clearly, the investigator interviewed the jurors between Cunningham's sentencing on June 23, 2002 and the affidavit's signing on July 16, 2003. *See* R. 192-2 (Sentencing Order at 8) (Page ID #4326); R. 192-4 (2003 Postconviction Pet.) (Page ID #5047). Because the record indicates the period during which these interviews occurred, the *Cunningham I* court "unreasonabl[y] determine[ed] the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "This partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

That Mikesell told Jackson's investigator that she did not have "pertinent" or "direct" information about Cunningham's "instant offense" is inapposite. R. 192-4 (Investigator Rep.) (Page ID #5132). Consider our recent decision in *Ewing*. In that habeas case, Ewing was convicted of a gang-related murder. One of Ewing's jurors filed an affidavit postverdict. She swore that two other jurors mentioned during deliberations that they had looked up a picture of Ewing on Facebook; had read a eulogy online about the victim; and Googled information about gang codes, history, and hierarchy. Based on that affidavit alone, the State of Michigan conceded, and this court agreed, that Ewing deserved a *Remmer* hearing. *Ewing*, 914 F.3d at 1029–30. We emphasized that the external information "had a clear potential for tainting the jury." *Id.* at 1030. We were unswayed by the Michigan Court of Appeals's determination "that the extraneous information was duplicative of evidence produced at trial and thus harmless"; that the Facebook picture was "innocuous and similar to many photos that were shown at trial"; that "Watson's eulogy contained no new, relevant information and presumably was discussed only in

passing"; and that "the information about gang activity and hierarchy was either patently obvious or easily inferred from witness testimony." *Id.* at 1029–30.

Likewise, any information that Mikesell's social-worker colleagues may have told her about Cunningham or that she learned from reading his file poses a glaring risk of taint.[4] Consider what Mikesell told Jackson's investigator. Mikesell stated that "there was nothing in Jeronique's life that could have possibly explained his participation in the instant offense" and that "Jeronique is an evil person." R. 192-4 (Investigator Rep.) (Page ID #5132). She mentioned that "some social workers worked with Jeronique in the past and were afraid of him" before explaining "if you observe one of the veins starting to bulge in his head, watch out and stay away because he might try to kill you." *Id.* She closed with: "Jeronique had no redeeming qualities." *Id.* Of course, we cannot tell from the investigator's report whether Mikesell developed these strong opinions because of information learned at trial or from her colleagues; a *Remmer* hearing is the appropriate forum to discern the answer. Just like the photo, eulogy, and gang information in *Ewing*, the information that might have been relayed to Mikesell is just as irrelevant to the crime but equally as charged with bias. Clearly, the prejudicial nature of the external information does not rise and fall on whether the information is "pertinent" or "direct[ly]" connected to a habeas petitioner's "instant offense." R. 192-4 (Investigator Rep.) (Page ID #5132).

We are aware that the district court allowed Cunningham to conduct limited depositions of three of the jurors—Freeman, Wobler, and Mikesell. And during her deposition, Mikesell denied that she spoke to her colleagues about Cunningham or read from his file during the trial. Even if we could consider the affidavits and depositions—which, again, we cannot under

---

[4]The dissent portrays Cunningham's claim of juror bias as "an allegation that, a year after trial Mikesell knew that some of her colleagues were afraid of Cunningham" and concludes that this "allegation, taken as true, is not nearly as prejudicial on its face as the bribery allegation in *Remmer* was." Dissent Op. at 55. The dissent both mischaracterizes Cunningham's allegations and conflates his allegations with one sentence in the investigative report read in isolation. Cunningham alleges that the information in the investigator's report, read in context with Mikesell's other statements and the timing of the investigation, plausibly give rise to an inference that Mikesell received during the trial information about Cunningham from social workers or Cunningham's case file. That allegation—that Mikesell received during the trial outside information that social workers were afraid of Cunningham—taken as true, is even more prejudicial than an FBI agent's inquiring about the juror's own conduct in *Remmer*. 347 U.S. at 229.

*Pinholster*—we would still grant Cunningham a *Remmer* hearing. *Remmer* was unambiguous: an allegation of extraneous influence entitles a defendant to a constitutionally meaningful investigation into juror bias at a hearing. Of course, we accord deference to state courts' management of *Remmer* hearings in habeas cases per § 2254(d)(1). *See Carroll v. Renico*, 475 F.3d 708, 712 n.3 (6th Cir. 2007). But no *Remmer* hearing occurred on this juror-bias claim in the Ohio courts. And the depositions taken in the federal habeas proceeding did not comport with the constitutional contours of a *Remmer* hearing. *See Lanier*, 988 F.3d at 295. Because the jurors were deposed outside the presence of the district judge, no factfinder had the opportunity to assess Mikesell's credibility as she testified that she did not talk to her coworkers about Cunningham and did not review his file until after the trial was over. The greater the probability of juror bias, moreover, the more searching the court's investigation must be. *See id.* Mikesell's statement to Jackson's investigator indicated bias against Cunningham. Freeman and Wobler also supplied evidence that Mikesell knew the victims' families (we explore this issue below). The discovery permitted in the habeas proceeding is not the constitutional equivalent of a *Remmer* hearing. The district court's permitting defense counsel to question just three jurors and the magistrate judge's limiting the scope of Mikesell's deposition placed unconstitutional constraints on defense counsel. To that end, Mikesell's denying during her deposition that she spoke to her colleagues does not eliminate Cunningham's entitlement to a proper *Remmer* hearing, and we must remand because we cannot say on this record that the failure to provide a *Remmer* hearing was harmless. *See Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 756 (6th Cir. 2021).[5]

---

[5]We have treated a trial court's failure to hold a *Remmer* hearing as a "trial error" subject to harmless-error review. *See Nevers v. Killinger*, 169 F.3d 352, 370–73 (6th Cir. 1999), *abrogated on other grounds by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000) (trial court's failure to investigate extraneous influence on jury was trial error subject to harmless-error review); *Nian*, 994 F.3d at 756 (ordering *Remmer* hearing because state court's failure to hold *Remmer* hearing for allegation of extraneous influence was not harmless).

Here, Cunningham's first juror-bias claim, which involves allegations of extraneous information learned from Mikesell's coworkers and a casefile, fits into the framework we applied in other cases where there were allegations of extraneous influence during the trial. *See, e.g.*, *Nevers*, 169 F.3d at 354; *Nian*, 994 F.3d at 753; *Ewing*, 914 F.3d at 1030. After a hearing, the trial court will be well equipped to make a finding whether the state court's *Remmer* error in this case was harmless. *See, e.g.*, *Barnes v. Joyner*, 751 F.3d 229, 253 (4th Cir. 2014) (remanding habeas petition to district court to hold *Remmer* hearing on claim of extraneous influence and to make harmless error determination).

To sum up, Cunningham's first state postconviction petition set forth a prima facie case of extraneous influence, i.e., that Mikesell's colleagues at Allen County Children Services or Mikesell's review of Cunningham's file relayed to her external information about Cunningham. The *Cunningham I* court unreasonably applied *Remmer* by refusing to grant Cunningham an evidentiary hearing. Cunningham is thus entitled to an evidentiary hearing for his first juror-bias claim involving Mikesell's obtaining prejudicial information about Cunningham from her colleagues or his file.

### 3. Juror-Bias Claim #2

To refresh, the *Cunningham III* court decided that it could not entertain Cunningham's second postconviction petition or motion for a new trial under Ohio law and refused to consider on the merits Cunningham's second juror-bias claim involving Mikesell's relationship with the victims' family. *Cunningham III*, 65 N.E.3d at 315, 317.[6] "It is axiomatic that state courts are the final authority on state law." *Hutchison v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984). And

---

[6]During oral argument, Ohio contradicted its brief's position that Cunningham procedurally defaulted his second juror-bias claim by arguing for the first time that the Ohio Court of Appeals adjudicated this claim on the merits. *Compare* Appellee's Br. #2 at 17–18, *with* Oral Arg. at 33:00–35:24. Ohio pointed to this sentence in *Cunningham III*: "Even were we to consider Cunningham's arguments that he satisfied R.C. 2953.23(A)(1)(b), we would conclude that he has not shown that, but for any purported constitutional error at trial, no reasonable fact-finder would have found him guilty of the offenses or found him eligible for a death sentence." *Cunningham III*, 65 N.E.3d at 315; Oral Arg. at 34:41–35:17.

After focusing on this sentence, we remain unswayed by Ohio's belated argument. In the paragraph preceding this single sentence, the Ohio Court of Appeals determined that Cunningham's failure to satisfy Ohio Rev. Code § 2953.23(A)(1)(a) "alone" deprived the state courts of "jurisdiction" to review Cunningham's second postconviction petition. *Id.* No doubt, the Ohio Court of Appeals clearly, expressly, and actually rested its judgment on a state procedural bar. *See Harris v. Reed*, 489 U.S. 255, 263 (1989); *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001). The in-the-alternative analysis following the words "even were we" is detached from the state appellate court's conclusive procedural determination. No one, for that matter, can read Ohio's selective slice of *Cunningham III* as a merits adjudication of *anything*. The Ohio Court of Appeals merely reasoned that Cunningham's allegation of a structural error such as juror bias is insufficient to satisfy Ohio Rev. Code § 2953.23(A)(1)(b). *See Cunningham III*, 65 N.E.3d at 315–16. So the Ohio Court of Appeals issued yet another procedural determination—not a merits decision. To the extent that one could read Ohio's chosen sentence as a merits adjudication of Cunningham's innocence of the alleged crime or innocence of the death penalty (which would demand a dubious and implausible linguistic stretch), deciding Cunningham's innocence is not pertinent to whether Mikesell was biased. Put simply: no merits determination of any juror-bias issue can be found anywhere in *Cunningham III*. Finally, if we did read this sentence, somehow, as a merits determination of the second juror-bias claim, Cunningham still prevails for the same reason that he succeeds for his first juror-bias claim. Per *Remmer*, there has been a credible allegation of juror bias via Mikesell's relationship with the victims' families. So if the *Cunningham III* court had denied Cunningham an evidentiary hearing on the merits, it unreasonably applied *Remmer*. But because no merits adjudication occurred in *Cunningham III*—which Ohio maintained all the way until our oral argument—we invoke § 2254(e)(2) instead of § 2254(d)(1).

we must presume that the *Cunningham III* court's factual findings are correct absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). But a faithful application of *Michael Williams* reveals that we may order an evidentiary hearing for this juror-bias claim under § 2254(e)(2).

First, Cunningham was at least as diligent as Williams had been about pursuing a remedy in state court. In *Michael Williams*, state postconviction counsel "did attempt to investigate [Williams's] jury" by petitioning for funding for an investigator "to examine all circumstances relating to the empanelment of the jury and the jury's consideration of the case." *Michael Williams*, 529 U.S. at 442 (citations omitted). By denying this request, Virginia "depriv[ed] [Williams] of a further opportunity to investigate." *Id.* The Court did not care that Williams's state postconviction petition was "prompted by concerns about a different juror" from the juror underlying his federal habeas juror-bias claim. *Id.* Nor did the Court alter its conclusion because the state postconviction petition contained mere "vague allegations" that "irregularities, improprieties and omissions exist[ed] with respect to the empaneling *[sic]* of the jury." *Id.* (alterations and emphasis in original, citation omitted).

Here, Cunningham sought an evidentiary hearing and discovery from the Ohio courts for his initial juror-bias claim; his claim was more concrete and substantiated than Williams's obscure juror-bias allegation had been. *Compare* R. 192-4 (2003 Postconviction Pet.) (Page ID #5085–91), *with Michael Williams*, 529 U.S. at 442. Because "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law," Cunningham crossed the Court's diligence threshold. *See Michael Williams*, 529 U.S. at 437; *see also Bowling v. Parker*, 344 F.3d 487, 511–12 (6th Cir. 2003); *Robinson v. Howes*, 663 F.3d 819, 824 (6th Cir. 2011); *cf. Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 465 (6th Cir. 2012).

Second, Cunningham had as little notice as Williams had about the facts underlying their respective juror-bias claims. In *Michael Williams*, the Court explained that nothing in the record would have notified a reasonable attorney that the juror deliberately omitted material information by remaining silent in voir dire. *See Michael Williams*, 529 U.S. at 442. So too here. The jury questionnaire and the voir dire transcript do not indicate that Mikesell was connected to the

victims' families. As in *Michael Williams*, Mikesell said nothing when the trial court asked if any prospective jurors had personal knowledge of the case. The investigator's comprehensive interview report also never mentions Mikesell's relationship with the victims' families. Put simply, nothing Mikesell wrote in her questionnaire, nothing Mikesell said at voir dire, and nothing in the interview report would have alerted a reasonable attorney about Mikesell's connection to the victims. *Cf. Hutchison v. Bell*, 303 F.3d 720, 747–48 (6th Cir. 2002) (concluding that petitioner failed diligently to develop facts underlying *Brady* claim when prosecution referred to undisclosed report at closing arguments, petitioner personally spoke to report's author, and subject of report came up in cross-examination).

We accept that Freeman may have told Jackson's investigator that Mikesell had brought up the victims' families at deliberations, but we deem this fact inapposite. In *Michael Williams*, the Court rejected the argument that Williams was not diligent because his state postconviction investigator would have discovered the juror's earlier marriage in the county's public records—

> We should be surprised, to say the least, if a district court familiar with the standards of trial practice were to hold that in all cases diligent counsel must check public records containing personal information pertaining to each and every juror. Because of [the juror's] and [the prosecutor's] silence, there was no basis for an investigation into [the juror's] marriage history.

*Michael Williams*, 529 U.S. at 443. That "[t]he investigator later confirmed [the juror's] prior marriage to [the witness] by checking Cumberland County's public records" did not sway the Court. *Id.* In short, the Court refused to draw the diligence bright line at what Williams could have discovered and underscored that diligence turned on notice. Turning back to the present case, we note that Freeman insisted that she had told the investigator about Mikesell's remarks about the victims' families during deliberations. R. 137-1 (Freeman Dep. at 15, 18, 19, 20) (Page ID #2464, 2467, 2468, 2469). But Freeman herself read the interview report, and she confirmed that the report contained no mention of her comments to the investigator about Mikesell. *Id.* at 18 (Page ID #2467). Ohio conceded at oral argument that Freeman's comments are not in the report. *See* Oral Arg. at 45:58–47:57. We cannot expect Cunningham's state postconviction counsel to read tea leaves in an empty cup. Because the report could not have

notified Cunningham's state postconviction counsel about Mikesell's relationship with the victims' families, what Freeman may have said to the investigator does not alter our outcome.

Third, *Cunningham III* sealed the diligence deal. In *Michael Williams*, the Court noted that state postconviction relief was unavailable to Williams when he had discovered the factual bases of his juror-bias and prosecutorial-misconduct claims. *See Michael Williams*, 529 U.S. at 443. At the time, Virginia law required indigent petitioners to file a state postconviction petition within 120 days of appointment of state postconviction counsel. *See id.* at 443–44 (citing VA. CODE ANN. § 8.01–654.1 (1999)). But Williams's federal habeas investigator discovered the juror's connections to the witness and the prosecutor long after that deadline. *See id.* at 444. So it was futile for Williams to return to the Virginia courts. *See id.*

Here, Cunningham discovered the facts underlying his second juror-bias claim after the *Cunningham I* court rejected his first postconviction petition. When this case initially arrived at our doorstep, Cunningham urged us that "[u]nder Ohio law, . . . there is simply no avenue for postconviction petitioners to obtain discovery." Appellant's Br. #1 at 23. Ohio countered that Cunningham "could and should have" presented this claim in the state courts because AEDPA guarantees habeas petitioners a "fair opportunity" in state courts to raise a constitutional claim. *See* Appellee's Br. #1 at 46. Because murky Ohio precedent did not clearly explain whether the state courts could hear this claim, we ordered Cunningham to attempt to seek relief in the Ohio courts. *See Cunningham*, 756 F.3d at 485.

By refusing to consider the merits of the claim, the *Cunningham III* court vindicated Cunningham's interpretation of Ohio law. Clearly, it was always "futile" for Cunningham to return to the Ohio courts. Like Williams, Cunningham "cannot be said to have failed to develop [his claims] in state court by reason of having neglected to pursue remedies available under [Ohio] law." *Michael Williams*, 529 U.S. at 444. Indeed, futility is clearer here than it was in *Michael Williams*. Conceivably, the Virginia courts could have interpreted state postconviction or equitable law to allow the commonwealth's courts to hear Williams's claim notwithstanding the state's filing deadline. Yet Williams never tried to file his three new habeas claims with the Virginia courts. *See Michael Williams*, 529 U.S. at 444. Compare Williams to Cunningham,

who sought and failed to obtain relief from the state courts. In this way, Cunningham acted more diligently than Williams had.

We address one crinkle in this case. As we mentioned, Virginia's postconviction-petition procedures had a hard filing deadline for indigent petitioners when *Michael Williams* was decided. *See* VA. CODE ANN. § 8.01–654.1 (1999)). Ohio's rules governing second or successive habeas petitions and motions for a new trial also have filing deadlines. *See* OHIO REV. CODE ANN. 2953.21(A)(2) (2014); OHIO R. CRIM. P. 33(B) (2014). But Ohio excepts from the filing deadlines incarcerated persons who were "unavoidably prevented" from developing the facts underlying their claim. *See* OHIO REV. CODE ANN. 2953.23(A)(1)(a) (2014); OHIO R. CRIM. P. 33(B) (2014). Virginia's statute contained no such exception; so the face of Virginia's statute made it "futile" for Williams to return to state court. Cunningham, by contrast, is not barred from pursuing state remedies by the black letter of Ohio's statutes and rules. Rather, the Ohio Court of Appeals's conclusion that Cunningham was not "unavoidably prevented" from developing the facts has rendered futile his return to state court.

This interstice between Ohio law in 2014 and Virginia law in 1999 does not rupture Cunningham's case. For one, *Michael Williams*'s futility analysis did not rise and fall on the reason why Williams could not return to the state courts. The Court merely determined that because "state postconviction relief was no longer available at the time the facts came to light, it would have been futile for petitioner to return to the Virginia courts." *Michael Williams*, 529 U.S. at 444. So too for Cunningham. After all, *Cunningham III* erased any doubt— Cunningham was never able to seek relief for his second juror-bias claim in the state courts.

Nor is the Ohio Court of Appeals's "unavoidably prevented" determination relevant to our § 2254(e)(2) diligence analysis. For one, diligence "is a question of federal law decided by federal habeas courts." *Boyle v. McKune*, 544 F.3d 1132, 1136 (10th Cir. 2008); *see also Michael Williams*, 529 U.S. at 429–38 (referring to no state-court findings and zero state law in promulgating and applying its diligence standards). "Unavoidably prevented," on the other hand, is a question of Ohio law. *See Cunningham III*, 65 N.E.3d at 314–15 (citing *State v. Creech*, 2013 WL 4735469, at *4 (Ohio Ct. App. Aug. 27, 2013)). Therefore, even after taking the *Cunningham III* court's findings of fact as true, *see* 28 U.S.C. § 2254(e)(1), and deferring

wholly to *Cunningham III*'s interpretation of state law that controlled when Cunningham sought an evidentiary hearing, *Boyle*, 544 F.3d at 1136, nothing in *Cunningham III* alters our diligence analysis.

To illustrate how the "unavoidably prevented" and diligence analyses are distinct, contrast *Cunningham III* with *Michael Williams.* The state appellate court, for example, cited state common law in reasoning that Cunningham's claim of ineffective assistance of state postconviction counsel suggests that his juror-bias claim could have been uncovered if he had been reasonably diligent. *Cunningham III*, 65 N.E.3d at 314. But the Supreme Court reasoned to the contrary—Williams's state postconviction counsel's half-baked attempt to investigate the whole jury based on a different juror's apparently biased conduct favored determining that Williams had been diligent. *See Michael Williams*, 529 U.S. at 442.

The *Cunningham III* court also reasoned that Cunningham's raising his first juror-bias claim shows that he was not unavoidably prevented from discovering the facts of his second juror-bias claim. *Cunningham III*, 65 N.E.3d at 314. On the contrary, the *Michael Williams* Court concluded that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." 529 U.S. at 437.

The *Cunningham III* court, moreover, reasoned that Cunningham should have discovered the connection between Mikesell and the victims' families because the investigator could have and did interview Mikesell, Freeman, and Wobler. *Cunningham III*, 65 N.E.3d at 314. For a § 2254(e)(2) analysis, however, "[t]he question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts." *Michael Williams*, 529 U.S. at 435. Here, the investigator tried to interview every juror and thoroughly grilled seven of them, including Mikesell, Freeman, and Wobler. Clearly, the state-law "unavoidably prevented" inquiry is wholly distinct from the federal-law diligence assessment.

Finally, Cunningham's diligence excuses any procedural default.  The *Michael Williams* Court explained that its analysis of Williams's diligence "should suffice to establish cause for any procedural default petitioner may have committed in not presenting these claims to the Virginia courts in the first instance." *Id.* at 444.  Because, as we have explained, the facts of this case are on all fours with *Michael Williams*, Cunningham's diligence likewise demonstrated cause.  And Cunningham has made a colorable claim that Mikesell was biased by a pre-existing relationship with the victims' families, and that her bias prejudiced him, requiring a § 2254(e)(2) hearing.  Because cause and prejudice excuses any default, and we again cannot say at this point whether Mikesell was actually biased and Cunningham's Sixth Amendment rights were violated, the federal courts may hold an evidentiary hearing under § 2254(e)(2).[7]

The dissent argues that Cunningham relies improperly on evidence—Freeman's and Wobler's testimony about Mikesell's statements during deliberations—that would be

---

[7]The district court's error arose from a misunderstanding of the relationship between diligence and procedural default.  The district court reasoned that a diligence analysis under § 2254(e)(2) is "not relevant" to a procedural-default analysis and that the state courts are the final arbiters of when an imprisoned person can obtain an evidentiary hearing in the state courts.  *Cunningham*, 2019 WL 6897003, at *11.  Because Cunningham had procedurally defaulted his second juror-bias claim, the district court deemed Cunningham's diligence to be irrelevant.  *See id.*  The district court further found that any diligence on Cunningham's part could not constitute cause to excuse his procedural default, reasoning that the *Michael Williams* Court's "discussion of the procedural default of the petitioner's juror-bias claims is dicta, and the circumstances under which the court found cause for the default are easily distinguished." *Id.* at *13.  "Here, unlike in *Williams*, Cunningham was able to return to state court with his newly developed claim, and the state courts found that under Ohio law and court rules, he was not unavoidably prevented from discovering, or reasonably diligent in attempting to discover, the factual basis of his claim sooner." *Id.*

We conclude that the district court was wrong.  True, we usually cannot upset Ohio courts' procedural determinations, nor can we dictate Ohio's rules for conducting evidentiary hearings.  *See Hutchison*, 744 F.2d at 46.  But § 2254(e)(2) governs the ability of the federal courts—not the state courts—to hold an evidentiary hearing.  *See Michael Williams*, 529 U.S. at 437.  As *Michael Williams* makes clear, diligence can excuse a procedural default.  The district court's interpretation of the interplay between procedural default and diligence erases the plain text of § 2254(e)(2) and ignores *Michael Williams* and *Pinholster*.  And *Michael Williams*'s discussion of procedural default was not dicta by any measure of what dicta means.  If Williams's diligence failed to excuse his procedural default, Williams could not have received an evidentiary hearing in any court.  Put another way, whether diligence can excuse a procedural default was necessary to the outcome of Williams's case.  *See Dictum*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Even if this were dicta, Supreme Court dicta is persuasive and cannot be ignored by lower courts for no good reason.  *See ACLU of Kentucky v. McCreary County*, 607 F.3d 439, 447–48 (6th Cir. 2010).  Finally, the district court erroneously found that no cause exists in Cunningham's case.  The issue is not whether Cunningham *could* have returned to the state courts but whether it was *futile* for Cunningham to have returned.  Again, *Cunningham III* eradicated any ambiguity:  Ohio law does not allow Cunningham to litigate his unadjudicated juror-bias claim in the state courts.  And, as we have already explained, the Ohio court's state-law "unavoidably prevented" analysis is distinct from our federal-law diligence determination.

inadmissible under Federal Rule of Evidence 606(b) as "an inquiry into the validity of a verdict or indictment."**8**  Dissent Op. at 57–62.  It is unclear whether the dissent faults Cunningham for relying on juror testimony to establish prejudice sufficient to excuse his procedural default or to meet the requisite showing to obtain a § 2254(e)(2) hearing.  In either case, Cunningham does not, and need not, rely on juror testimony.

First, Cunningham does not need to rely on juror testimony at this stage because a § 2254(e)(2) hearing will afford him an opportunity to show prejudice.  In *Michael Williams*, the Supreme Court decided that lower courts on remand would be best positioned to decide the prejudice issue even though Williams offered only "suspicions" and "vague allegations" of juror bias.  529 U.S. at 442, 444.  The Court's reasoning for deferring to lower courts follows logically from the inextricable nature of the actual bias and prejudice inquiries.  Whether a juror was actually biased sufficient to "taint the jury to [the defendant's] detriment," *see Ewing*, 914 F.3d at 1031, and whether that bias would have so prejudiced the defendant to change the outcome of the trial, *see Jones v. Bell*, 801 F.3d 556, 564 (6th Cir. 2015), are closely related.**9**  Thus, even if a defendant's allegations are "vague" or not supported by any testimony, a defendant's "reasonable efforts" in uncovering evidence of actual bias give him an opportunity to explore both actual bias and prejudice at an evidentiary hearing.  *Michael Williams*, 529 U.S. at 442, 444.  A § 2254(e)(2) hearing will resolve whether Mikesell was actually biased (and for the reasons described below, Cunningham need not rely on juror testimony about trial deliberations to do

---

**8**Federal Rule of Evidence 606(b) provides:

(b) During an Inquiry into the Validity of a Verdict or Indictment.

(1) *Prohibited Testimony or Other Evidence.* During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2*) Exceptions.* A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

**9**Also closely related is the doctrine of harmless error. We have long established that the presence of a biased juror is a structural error not subject to harmless-error analysis. *See Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001).

so). If Mikesell was actually biased, then Cunningham will likewise establish prejudice to excuse his default.

As for the threshold evidentiary showing needed to obtain a hearing under § 2254(e)(2), the dissent misunderstands the nature of Cunningham's second juror-bias claim. Although we have held that a habeas petitioner must conform to Federal Rule of Evidence 606(b) when seeking a *Remmer* hearing based on extraneous influence, *see Smith v. Nagy*, 962 F.3d 192, 200 (6th Cir. 2020), Cunningham's second juror-bias claim, which involves an alleged undisclosed pre-existing relationship with the victims' families, does not involve allegations of extraneous influences.[10] We have treated a trial court's failure to hold a *Remmer* hearing as a due process violation closely related to, but distinct from the underlying question of juror bias in violation of the Sixth Amendment right to an impartial jury. *See Ewing*, 914 F.3d at 1030.

Cunningham's second juror-bias claim is thus more akin to *Michael Williams* and the line of cases addressing juror omissions during voir dire. *See, e.g.*, *English v. Berghuis*, 900 F.3d 804, 813 (6th Cir. 2018) (applying framework under *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984), to determine whether juror bias warrants new trial). But even if Cunningham is not able to show that Mikesell was untruthful during voir dire, he is still entitled to relief if he is able to show at the § 2254(e)(2) hearing that Mikesell was actually or impliedly biased. *See McDonough*, 464 U.S. at 556–57 (Blackmun, J., concurring) (explaining that advent of *McDonough* test did not foreclose defendant from proving juror bias via a showing of actual or implied bias, regardless of truthfulness of juror's voir dire answers); *Zerka v. Green*, 49 F.3d 1181, 1186 n. 7 (6th Cir. 1995); *Gonzales v. Thomas*, 99 F.3d 978, 985–86 (10th Cir. 1996).

It would therefore be possible for Cunningham to prove that Mikesell was actually biased without relying on juror testimony in violation of Federal Rule of Evidence 606(b). For

---

[10]Evidence supporting Cunningham's first juror-bias claim—that Mikesell received information about Cunningham from her coworkers and from reading his casefile—would clearly constitute "extraneous prejudicial information" as defined by Federal Rule of Evidence 606(b)(2)(A) even if it did come in the form of juror testimony and would thus be admissible under that rule. *See United States v. Davis*, 177 F.3d 552, 556 (6th Cir. 1999) (finding extraneous influence where juror's employee provided juror with information that members of the community were discussing juror's role in the proceedings).

example, Cunningham could rely on Mikesell's testimony or the testimony of a victim's family member to show that Mikesell answered untruthfully "a material question on *voir dire*" that "would have provided a valid basis for a challenge for cause." *English*, 900 F.3d at 813 (quoting *McDonough*, 464 U.S. at 556). Cunningham could offer evidence to prove, for example, that Mikesell's relationship with the victims' families caused her to answer dishonestly that she did not have any personal knowledge of the facts of the case, R. 194-1 (Trial Tr. at 13–14) (Page ID #9181–82), or that working for family services would prevent her from being fair and impartial towards Cunningham, R. 194-1 (Trial Tr. at 208–09) (Page ID #9376–77). Or Cunningham could elicit testimony to show that the nature of Mikesell's relationship with the victim constituted an "extreme situation[] that would justify a finding of implied bias," sufficient to overturn a verdict. *English*, 900 F.3d at 816 (quoting *Phillips*, 455 U.S. at 222 (O' Connor, J., concurring)). Allowing such an evidentiary proceeding would therefore not be fruitless even if Rule 606(b) were faithfully applied during the hearing.

Whether or not Rule 606(b) bars the testimony of jurors Freeman and Wobler, Cunningham does not need to rely on that testimony to be granted an evidentiary hearing under § 2254(e)(2). Again, in *Michael Williams*, the court allowed Williams an evidentiary hearing to prove actual bias even though his allegations were "vague," reasoning that "the vagueness was not [Williams's] fault." 529 U.S. at 442–43. Cunningham alleged in his 2018 post-conviction petition that Mikesell "did not reveal her connection to Cunningham or the victims" and that "Mikesell was biased against Cunningham because of a current or future relationship with the victims' families." R. 188-1 (2018 Postconviction Pet. at 8–9) (Page ID #2835–36). Such allegations were even more specific than the "vague allegations" of "irregularities, improprieties and omissions . . . with respect to the empaneling *[sic]* of the jury" Williams alleged. *Michael Williams*, 529 U.S. at 442. Just like Williams, Cunningham attempted to offer more evidence in support of his allegations, but his failure to do so was not his fault. As Cunningham noted in his 2018 post-conviction petition, Cunningham asked Mikesell about her relationship with the victims during her deposition, but the district court did not allow Mikesell to answer. R. 188-1 (2018 Postconviction Pet. at 9) (Page ID #2836); R. 188-1 (Mikesell Dep. at 19–20) (Page ID #2917). Cunningham may not be able to rely on juror testimony at the evidentiary hearing, but he does not need to do so to be offered an *opportunity* to prove actual bias. The dissent makes

some valid points, which will no doubt constrain the parameters of the evidentiary hearing, but they have no bearing on Cunnningham's right to such a hearing.

* * *

This case is *Michael Williams*, blow-for-blow. The Ohio courts never adjudicated the merits of Cunningham's claim that the victims' families were Mikesell's clients. And Cunningham diligently sought to develop the factual basis of his second juror-bias claim in the Ohio courts. The federal courts may accordingly hold an evidentiary hearing for his second juror-bias claim concerning Mikesell's relationship with the victims' families under § 2254(e)(2).

### 4. Remedy

To recap, Cunningham is entitled to habeas relief for both of his juror-bias claims. When we determine in a habeas case that a *Remmer* hearing is in order, we often grant habeas relief unless the State takes steps to conduct a proper evidentiary hearing on juror misconduct within a reasonable time. *See Ewing*, 914 F.3d at 1034; *see also Nian*, 994 F.3d at 759 (citing *Ewing* and issuing the same remedy). Our customary remedy makes sense for Cunningham's first juror-bias claim. But Cunningham receives relief for his second juror-bias claim under § 2254(e)(2), which governs the federal courts—not the state courts. And conducting parallel hearings about the same juror in the state and federal courts with the same witnesses makes no sense, depletes judicial resources, and wastes everyone's time.

We therefore order the federal district court to conduct a *Remmer* hearing to investigate both juror-bias claims. Cunningham is entitled to a "'meaningful opportunity' to demonstrate jury bias at the *Remmer* hearings." *Lanier*, 988 F.3d at 295 (quoting *Herndon*, 156 F.3d at 637). Under Sixth Circuit precedent, Cunningham bears the burden of proving actual or implied bias at that hearing. *See Zelinka*, 862 F.2d at 95; *Treesh*, 612 F.3d at 437. Because this evidentiary hearing will transpire nearly two decades after Cunningham's trial, we acknowledge that it may be complicated to locate jurors and to navigate the jury's waning memories. *See Lanier*, 988 F.3d at 298. "[T]he district court should [be] extra attentive [and] ensur[e] that this belated, post-verdict hearing would serve as an adequate forum for investigating juror bias, especially because

the accuracy of the information yielded at *Remmer* hearings declines over time." *Id.* If the hearing turns out to be "both constitutionally deficient and practically pointless," *id.*, Cunningham is free to seek habeas relief again, *see Ewing*, 914 F.3d at 1033.

## II. ISSUE #3: INEFFECTIVE COUNSEL AT PENALTY PHASE

Whether Cunningham's trial counsel ineffectively presented mitigation evidence presents a close question. Cunningham is correct: his lawyer's subpar performance at the penalty phase flouted the Constitution. The Ohio Court of Appeals's decision on this issue did not, however, unreasonably apply Supreme Court precedent. We therefore cannot grant Cunningham habeas relief for this claim.

### A. Background

Cunningham's lawyer presented meager mitigating evidence at the penalty phase. Just three witnesses testified on Cunningham's behalf: his sister Tarra, his mother Betty, and forensic psychologist Dr. Daniel Davis. Relevant here, Tarra and Betty confirmed that Betty beat Cunningham; Betty's partners beat Betty, Cunningham, and his siblings; and Cunningham witnessed Betty's stabbing his stepfather to death. R. 194-2 (Trial Tr. at 29–33, 40–44, 47–48) (Page ID #10762–66, 10773–77, 10780–81). The two women, however, offered scant details about the abuse. Defense counsel, for example, asked Tarra if Betty physically abused Cunningham, to which Tarra replied "Yes." *Id.* at 33 (Page ID #10766). The lawyer posed to Tarra no further questions about Betty's abuse of Cunningham; Tarra said no more. When Cunningham's attorney asked Betty if she had disciplined Cunningham, Betty stated that she had only "whip[ped] his butt." *Id.* at 47 (Page ID #10780). She denied having used a stick or her hand to hit Cunningham before confirming that she had disciplined Cunningham with a belt. *Id.* at 47–48 (Page ID #10780–81). She hedged and denied that Cunningham's stepfather abused her children. *Id.* at 42 (Page ID #10775). According to Betty, he only whipped her children with a belt—"like any normal parent would." *Id.* When defense counsel asked if Betty had ever attempted suicide, she responded that she had tried to kill herself before she had children. *Id.* at 48 (Page ID #10781). Cunningham's attorney said nothing further. The lawyer did not press Betty or Tarra about specific incidents, the nature, or the consistency of Betty's abuse of

Cunningham. When asked why Cunningham's life should be spared, Betty mentioned that Cunningham visited her at her nursing home. *Id.* 49–50 (Page ID #1078–83).

Davis was more specific than Tarra and Betty were. Davis attested that he reviewed records from Allen County Children Services. *Id.* at 58 (Page ID #10791). Citing these records, Davis explained that Betty once abandoned her children and moved to Indiana. *Id.* at 69 (Page ID #10802). Cunningham and his siblings were shuttled between Betty, their grandmother, children services, and foster homes. *Id.* at 69–70 (Page ID #10802–03). After the children missed school for twelve days, Davis testified, the children's elementary-school principal visited Betty's house and found the kids by themselves. *Id.* at 70 (Page ID #10803). Once, Betty told a visiting caseworker that she would "blow the caseworker away" should the caseworker return for another home visit. *Id.* Davis affirmed that Cunningham had been physically abused. *Id.* Davis pointed to three incidents of physical abuse described in the children-services agency's records. *Id.* at 70–71 (Page ID #10803–04). Betty, for example, once beat Cunningham with a switch because he stole twenty dollars from her; she bruised his arm and cut his forehead. *Id.* at 70 (Page ID #1083). A year later, Betty beat and bruised Cunningham for supposedly taking Betty's money. *Id.* at 71 (Page ID #10804). Betty later beat and bruised Cunningham with an extension cord. *Id.* Davis mentioned in passing that Betty overdosed on pills once. *Id.*

Davis dedicated most of his testimony, however, to classifying Cunningham as "antisocial" and "psychopathic." *Id.* at 80–81 (Page ID #10813–14). Davis affirmed that antisocial persons are at risk of "criminality" and "violence," "typically lack empathy," and "tend to be highly manipulative"; he averred that Cunningham exhibited an antisocial "personality." *Id.* at 81–82 (Page ID #10814–15). Davis also diagnosed Cunningham with malingering, explaining that Cunningham had feigned illness to avoid responsibility or work. *Id.* at 82–83 (Page ID #10815–16).

Cunningham's state postconviction petition asserted that his trial counsel "failed to reasonably and competently investigate, prepare and present mitigating evidence" at his sentencing phase. R. 192-4 (2003 Postconviction Pet.) (Page ID #5091). Raising four subclaims, Cunningham asserted that his lawyer should have introduced (1) testimony from employees of or records supplied by Allen County Children Services; (2) testimony from a

caretaker at Betty's nursing home that Cunningham cared for Betty; (3) the details and results of a "voice stress analyzer" lie-detector test that indicate that Cunningham told the police that he did not fire his weapon at the crime scene; and (4) testimony from a cultural expert. *Id.* (Page ID #5092, 5095, 5098, 5101). Cunningham attached to his postconviction petition sixty-three pages of Allen County Children Services records. R. 192-4 (Children-Servs. Rep. at 1) (Page ID #5155). He also affixed Jackson's investigator's report, which, as explained in the previous section, summarized the investigator's posttrial interviews of six of Cunningham's jurors and one alternate. R. 192-4 (Investigator Rep.) (Page ID #5122).

The children-services report does include Tarra's, Betty's, and Davis's anecdotes but also contains substantial mitigating information that never surfaced at sentencing. *See generally* R. 192-4 (Children-Servs. Rep.) (Page ID #5155–5217). Betty, for example, attested that she had tried to kill herself before she had children. The children-services records unveil a bleaker picture. When Cunningham was just ten years old, one of Betty's boyfriends beat Betty, broke into the family home, and tried to rape her in front of the children on multiple occasions. *Id.* at 7, 48 (Page ID #5161, 5200). Ostensibly to prevent herself from killing her boyfriend, Betty sliced her wrists open when her children were at home. *Id.* at 6–7 (Page ID #5160–61).[11] The police discovered Betty, wrists slashed, drinking a beer with blood trickling from her arms. *Id.* at 6 (Page ID #5160). The children's bedroom brimmed with mounds of garbage, bottles, cans, paper, dirt, dried food, dirty clothes, broken glass, and junk. *Id.* at 6, 43 (Page ID #5160, 5195). The kids had no beds or bedding; cockroaches bit them as they slept on the floor. *Id.* at 43 (Page ID #5195). The children, covered in bug bites, told children services that they competed to smash the most cockroaches at night. *Id.* at 44 (Page ID #5196). The bathroom was smeared with filth and blood. *Id.* at 43 (Page ID #5195). A large, fresh pool of blood dripped from the dining-room table onto the floor and chairs. *Id.* at 43 (Page ID #5195). Broken glass piled in one corner of the dining room; garbage concentrated in another. *Id.* Sitting on the floor,

---

[11]Cunningham may have been staying with his aunt during the suicide incident. R. 192-4 (Children-Servs. Rep. at 42) (Page ID #5194). This traumatic attempted suicide, the state of the family home, and the starvation, however, were still pertinent to Cunningham's case at the penalty phase.

Jackson—a baby at the time—ate from an open box of garbage and glass. *Id.* The "very dirty" children were caked in dried blood. *Id.* at 44 (Page ID #5196).

The kids told the police that they "didn't eat every day" because Betty spent the little money that she had on beer. *Id.* at 6, 36, 41 (Page ID #5160, 5188, 5193).[12] They relayed that "they had not eaten since yesterday and that since mommy wanted to kill herself today they weren't going to eat today." *Id.* at 43 (Page ID #5195). The children were put in a foster home. *Id.* On the way, a caseworker took the children to a McDonalds, but the children hid their food under the caseworker's car seat. *Id.* at 44 (Page ID #5196). The children explained that they thought the foster family would withhold food when they saw the children eating. *Id.* The timing and violent nature of Betty's suicide attempt, the children's witnessing multiple attempted rapes, the horrendous state of the family home, and the children's starvation were never brought up during Cunningham's sentencing.

At least three specific incidents involving Betty's beating Cunningham and the extent of her physical abuse were never mentioned at sentencing. Once, Cunningham's school nurse discovered that Cunningham smelled "foul," his hands and clothes were dirty, his hair was uncombed, there were "moderate bruises" on his left upper arm, there were "mild bruises" on his right upper arm, and "old bruises" on his legs and buttock. *Id.* at 28 (Page ID #5180). Cunningham told children services that his mother hit him with a broom. *Id.* On another occasion, Cunningham lost twenty-one dollars of "Boy Scout tickets" at school. *Id.* at 59 (Page ID #5211). Betty beat him with an extension cord. *Id.* at 58 (Page ID #5210). It is unclear whether the extension-cord episode was separate from the Boy Scout tickets incident. On another occasion, a bruise-covered Cunningham approached his grandmother and told her that the children were left alone. *Id.* at 58 (Page ID #5210). The grandmother refused to take them in; she told Cunningham, "that's your problem." *Id.* Cunningham told children services that he was frequently beaten because he was expected to watch his siblings, clean, and cook. *Id.* Cunningham relayed that his mother had recently beaten him and his siblings when she found the home in slight disarray. *Id.* Betty, Cunningham told children services, "is either going to 'beat

---

[12]Betty used the children's social security money to pay for her alcohol. R. 192-4 (Children-Servs. Rep. at 57) (Page ID #5209).

me to death or kill me.'" *Id.* Yet children services refused to place the children in another home, instead sending Cunningham back to Betty. *Id.* at 58–59 (Page ID #5210–11). No one spoke about these three beating incidents at sentencing, and no one mentioned that Cunningham's grandmother and children services refused to assist Cunningham and his siblings even though Cunningham told them that his mother would beat him to death.

Although Davis mentioned that Betty threatened to "blow" a caseworker "away," he missed other incidents involving Betty's threatening caseworkers with violence. Betty once told Cunningham's stepfather to hit a caseworker. *Id.* at 39 (Page ID #5191). Betty told another caseworker that she had a dream about beating that caseworker to death, mimicked said beating, and stated that she would kill the caseworker and that she was "going to [the caseworker's] home to get you." *Id.* at 55–57 (Page ID #5207–08).

The report also includes details about Cunningham's relationship with his siblings that were cursorily mentioned but inadequately presented at sentencing. For example, trial counsel asked Tarra, "Jeronique do a good job taking care of his sisters and half-brothers?" R. 194-2 (Trial Tr. at 32) (Page ID #10765). To which Tarra answered, "yes." *Id.* Trial counsel did not introduce evidence from the report that ten-year-old Cunningham had to "watch the children, clean and keep the home clean, and cook on several occasions when Betty is drinking"; that Cunningham had to "watch the baby"; and when Cunningham was put in a foster home away from his siblings, he was "concerned about his brothers and sisters [] [,] wants to return home to take care of them[,] [and] goes over to the home daily to [e]nsure that they have food and are OK." R. 192-4 (Children-Servs. Rep. at 9, 26, 40) (Page ID #5163, 5178, 5192).

Penalty-phase evidence of Betty's neglect of the children was similarly limited to Tarra's confirmation that Betty "left the children home" for "a couple of days" and Davis's affirmation that Cunningham "would go from his grandmother to children's services to maybe home for a short period of time[.]" R. 194-2 (Trial Tr. at 32, 69–70) (Page ID #10765, 10802–03). No one mentioned the extraordinary frequency with which Cunningham was placed with his grandmother, his aunt, and foster families or how traumatizing that was for Cunningham. *See generally* R. 192-4 (Children-Servs. Rep.) (Page ID #5155–5217). No one mentioned at sentencing, moreover, that Betty refused to take Cunningham to counseling after he witnessed

her killing his stepfather, even though Cunningham repeatedly told children services that the stabbing made him scared of Betty. *Id.* at 26–28 (Page ID #5178–80). Also, Betty repeatedly expressed to children services that she did not consider using a belt or a switch to beat children to be child abuse. *Id.* at 29–30 (Page ID #5181–82). This too never came up at sentencing. Cunningham's foster parents noticed that Cunningham "sometimes forgets that he is a younger boy," and the records show that Cunningham had bed-wetting problems. *Id.* at 31, 41 (Page ID #5183, 5193). This, likewise, was never brought up at sentencing. Davis testified that Betty once overdosed on pills. But Davis did not mention that it was nine-year-old Cunningham who discovered Betty overdosed and unconscious. *Id.* at 36 (Page ID #5188). Nor did Davis explain that after the extension-cord-beating incident, Cunningham appeared "very frightened" of Betty and told Betty that "she drank too much and left them alone, and he had to watch all the kids." *Id.* at 38, 55 (Page ID #5190, 5207).

In postconviction proceedings, the Ohio Court of Appeals dismissed on the merits Cunningham's claim of ineffective assistance of counsel. *See Cunningham I*, 2004 WL 2496525, at *9–11.[13] Cunningham preserved all four subclaims in his federal habeas petition. R. 19-8 (Habeas Pet. at 78) (Page ID #157).

## B. Analysis

To demonstrate ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687, 691 (1984). We begin by rejecting Cunningham's second, third, and fourth subclaims, i.e., that defense counsel should have introduced testimony from one of Betty's caretakers (subclaim two); the details and results of a lie-detector test (subclaim three); and testimony from a cultural expert (subclaim four). First, testimony from a caretaker and evidence about the lie-detector test would have been cumulative. Betty testified about how Cunningham cared for her and visited her at the nursing home. And, as explained in the following section, the jury had already heard

---

[13]The Ohio Supreme Court rejected a related argument that Cunningham raised on direct appeal—that "[defense] counsel should have made a more 'powerful plea' to spare Cunningham's life" at sentencing. *Cunningham II*, 824 N.E.2d at 526. Cunningham did not raise his powerful-plea argument in this appeal. *See* Appellant's Br. #1 at 88–89.

significant testimony from eyewitnesses and experts at the guilt phase about whether Cunningham fired a weapon that night.  Second, Cunningham's habeas petition and appellate brief do not articulate how the absence of cultural testimony prejudiced the defense.  *See* Appellant's Br. #1 at 99–105.  Thus, the Ohio Court of Appeals did not unreasonably apply Supreme Court caselaw in dismissing these three subclaims on the merits.

Cunningham's first subargument—that defense counsel should have investigated, prepared, and presented the children-services records—is his only meritorious ground for relief. We focus on that subclaim here.  We apply § 2254(d)(1) deference to *Cunningham I*, and we may look only at the record before the Ohio Court of Appeals—the sentencing-hearing transcript, the children-services records, and Jackson's investigator's report.  *See Pinholster*, 563 U.S. at 181.

Cunningham argues that his trial counsel ineffectively failed to introduce the children-services records.  Appellant's Br. #1 at 92.  The State responds that (1) "trial counsel made a strategic decision to have Cunningham's family members give a real life account of Cunningham's childhood, instead of putting the jury to sleep with a bureaucratic case worker going over hundreds of records reading to the jury the minute details of Cunningham's childhood"; and (2) "[t]he Allen County Children Services records are not substantially different, neither in strength nor subject matter, than what was testified to at the penalty phase." Appellee's Br. #1 at 138.

Ohio's first argument holds no water.  For one, the State describes a false dichotomy. A happy medium lies between data dumping and an evidence vacuum:  a social worker with the Allen County Children Services could have read out or described relevant portions of the agency's records.  Our precedent, moreover, counsels against anointing the let's-not-bore-the-jury-with-records approach as a viable penalty-phase strategy.  In *Johnson v. Bagley*, Johnson's defense attorney "obtained a large number of files from the Ohio Department of Human Services but apparently never read them."  544 F.3d 592, 600 (6th Cir. 2008).  Counsel "simply submitted them to the jury—unorganized and without knowing whether they hurt Johnson's strategy or helped it."  *Id.*  Of course, the opposite occurred here:  the jury never saw a single page of the children-services records.  A closer look at *Johnson* reveals that Ohio's health-services records

showed that Johnson's grandmother had a lengthy history of abuse and that the State was worried about placing the young Johnson in her custody. *See id.* Yet defense counsel's penalty-phase strategy revolved around that grandmother's testimony. *See id.* at 599–600. Therefore, the *Johnson* court chided that the records should have "tipped [defense counsel] off to a different mitigation strategy" and "would have avoided the pitfall of submitting records to the jury that directly contradicted their theory that [the grandmother] was a positive force for change in [Johnson's] life." *Id.* at 600–01.

So too in Cunningham's case. Here, Cunningham's counsel called Betty to the stand and elicited from her half-hearted and perfunctory confirmations that she whipped Cunningham with a belt and that her partner whipped her children like "normal" parents do. The lawyer did not solicit more details about the abuse; he also failed to correct Betty when she lied about the timing of her suicide attempt and about how she never hit Cunningham with a stick or her hand. Instead, the lawyer prodded Betty to speak about how Cunningham cared for her at her nursing home. Like in *Johnson*, the children-services records here demonstrated Betty's malevolent effect on Cunningham's childhood. Her weak testimony lacerated the far-more-compelling, unintroduced evidence about the monstrous childhood abuse that Cunningham suffered at his mother's hands. And introducing lengthy excerpts from the records—no matter how "bureaucratic"—made far more sense than calling an expert to testify that Cunningham was a lying, manipulative, malingering antisocial psychopath. Asking Betty and Davis to recount unconvincingly a handful of contextless anecdotes instead of calling a social worker from Allen County Children Services to lay out substantial portions of the agency's records simply cannot be written off as strategy.

Ohio's second argument—that the children-services records overlapped with the testimony that was introduced at the penalty phase—presents a close call. The Court's ineffective-assistance-of-counsel precedent extends across a spectrum. Habeas petitioners are entitled to relief when their trial counsel fails "their obligation to conduct a thorough investigation of the defendant's background[,]" *Terry Williams*, 529 U.S. at 396, as dictated by "reasonable professional judgment," *Wiggins*, 539 U.S. at 527. So, at one pole, the Court has granted relief in egregious scenarios involving penalty-phase lawyers failing to investigate *any*

pertinent records or to interview *any* relevant witnesses. *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (granting relief when defense counsel failed to obtain defendant's school, medical, or military service records and to interview any of defendant's family); *Terry Williams*, 529 U.S. at 395 ("[Defense counsel] failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood[.]"). At the other pole, the Court has denied relief when trial counsel conducts a substantial investigation and presents significant mitigating evidence. *See, e.g.*, *Bobby v. Van Hook*, 558 U.S. 4, 10–13 (2009). In between the poles are cases in which counsel has conducted *some* investigation into the defendant's personal background. The Court has issued inconsistent conclusions in those cases. *Compare Wiggins*, 539 U.S. at 526, *with Pinholster*, 563 U.S. at 190–94.

Obviously, this case does not belong at the no-investigation-at-all pole. Cunningham's lawyer, at minimum, interviewed Tarra and Betty. And Davis referred to the children-services records in his testimony. But Cunningham's case does not fit at the substantial-investigation-and-significant-presentation pole either. Cunningham's lawyer introduced mere bare-bones facts of Cunningham's personal background and omitted significant detail and specific episodes of abuse. Cunningham's case is distinguishable from every single case in the Court's ineffective-assistance-of-counsel canon. So, thanks to murky precedent, whether Cunningham should receive habeas relief for this claim is a close question.

Consider, for example, *Van Hook*. There, defense counsel spoke nine times with Van Hook's mother, once with both parents together, twice with an aunt, and thrice with a family friend; contacted two expert witnesses; reviewed military records; attempted to obtain medical records; and considered enlisting a mitigation specialist. *See Van Hook*, 558 U.S. at 9. The lawyer called eight mitigation witnesses who outlined Van Hook's traumatic childhood. *See id.* at 5. Van Hook argued that his lawyer should have contacted his stepsister, two uncles, two aunts, and a psychiatrist who once treated his mother. *See id.* at 11. The Court concluded that defense counsel's investigation was reasonable in scope, reasoning that "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Id.* Specifically, only one of Van Hook's uncles and the stepsister arguably would have added "new, relevant information" at the

penalty phase; the uncle would have testified that Van Hook's mother was temporarily committed to a psychiatric ward, and the stepsister would have attested that Van Hook's father frequently hit him and tried to kill his mother. *Id.* at 12. But other witnesses had already repeatedly and thoroughly testified to both facts at sentencing. *See id.* Because Van Hook had not shown how the uncle's and stepsister's "minor additional details" about already introduced and thoroughly discussed mitigating evidence "would have made any difference," the Court concluded that Van Hook had failed to demonstrate prejudice. *Id.*

Cunningham's case is not *Van Hook*. Like Van Hook's witnesses, Cunningham's witnesses acknowledged that Cunningham suffered physical abuse, neglect, and exposure to violence. But the perfunctory evidence presented at Cunningham's sentencing was far less substantial than the thorough, highly detailed evidence in *Van Hook*. In Van Hook—

> The trial court learned, for instance, that Van Hook (whose parents were both "heavy drinkers") started drinking as a toddler, began "barhopping" with his father at age 9, drank and used drugs regularly with his father from age 11 forward, and continued abusing drugs and alcohol into adulthood. The court also heard that Van Hook grew up in a "'combat zone'": He watched his father beat his mother weekly, saw him hold her at gun and knifepoint, "observed" episodes of "sexual violence" while sleeping in his parents' bedroom, and was beaten himself at least once. It learned that Van Hook, who had "fantasies about killing and war" from an early age, was deeply upset when his drug and alcohol abuse forced him out of the military, and attempted suicide five times (including a month before the murder). And although the experts agreed that Van Hook did not suffer from a "mental disease or defect," the trial court learned that Van Hook's borderline personality disorder and his consumption of drugs and alcohol the day of the crime impaired "his ability to refrain from the [crime]," and that his "explo[sion]" of "senseless and bizarre brutality" may have resulted from what one expert termed a "homosexual panic."

*Id.* at 10–11 (citations omitted, alterations in original).

Tarra and Betty, by contrast, merely said "yes" when asked if Cunningham was beaten by Betty and her boyfriends and if Cunningham had to care for his siblings. That's it. No other details from the children-services report were provided. Yes, Davis recounted three episodes involving Betty's beating Cunningham and one in which Betty threatened to blow a caseworker away. Per *Van Hook*, evidence in the children-services records about these four incidents might be cumulative. But no witness mentioned Betty's boyfriend attempting to rape her in front of the

children; the timing of Betty's traumatic attempted suicide; the disgusting state of the family house; that Betty and the foster families starved the children; that Betty's grandmother and children services refused Cunningham's pleas for help; that Cunningham found Betty when she overdosed; that Betty refused to take Cunningham to counseling after she killed his stepfather in front of him; or that the traumatized nine-year-old Cunningham wet his bed and forgot his age. Such evidence cannot be described as "minor additional details" about information that had already been discussed at great length at the penalty phase. *Cf. Van Hook*, 558 U.S. at 4, 12.

And, unlike in *Van Hook*, the failure to introduce the mitigating information in the children-services report here was highly prejudicial. All six jurors who were interviewed posttrial conveyed that Cunningham's attorney was abysmal during the penalty phase. R. 192-4 (Investigator Rep.) (Page ID #5122–32).[14] Six out of six expressed that the defense's poor performance was tantamount to supplying no mitigating evidence whatsoever. *Id.* The posttrial

---

[14]According to Juror Cheryl Osting—

> [S]he was distressed because the attorneys could not come up with anything at the sentencing/mitigation hearing. She also said that the psychologist said that the defendant did not suffer from a mental illness but did suffer from a mental disorder at times and was very manipulative. All 12 jurors wanted the defense to give them anything which they could use in mitigation but the defense did not deliver anything. She remembered that the jurors deliberated for 3 hours trying to find a mitigating factor but could not find anything and that the attorneys did not give a good defense at the mitigation hearing. . . . [T]he jurors prayed for one factor they could have used in mitigation but there was no mitigating factors to be found.

R. 192-4 (Investigator Rep.) (Page ID #5122–23). Juror Staci Freeman "believe[d] that the defense performed poorly at the sentencing hearing[,]" that Tarra was "high on drugs" during her testimony, and that Cunningham's foster families or social workers who knew Cunningham should have testified. *Id.* (Page ID #5125). She "might have been swayed if other professionals who knew [Cunningham] when he was a younger man [testified] and said something positive about him, might have swayed her vote for the death penalty to life in prison." *Id.* She was "upset because the defense did not offer any mitigating factors during the sentencing phase which would indicate to her and the rest of the jurors that Jeronique Cunningham had a soul." *Id.* (Page ID #5126). Juror Roberta Wobler complained that "no one" was "present to testify and corroborate testimony from [Betty] about anything of a positive nature in [Cunningham's] life" and that the jurors were "searching for anything of a mitigating factor[.]" *Id.* (Page ID #5127). To Wobler, "the defense could have significantly improved on their presentation if only they would have included corroborating witnesses." *Id.* (Page ID #5128). She was "really not in favor of the death penalty but because she could find absolutely no mitigating factors regarding Jeronique, she voted for the death penalty." *Id.* Juror Douglas Upshaw "concluded that the defense did not present any mitigating factors which would prevent the defendant from being sentenced to death." *Id.* (Page ID #5129). Juror Jeanne Adams "said that at the sentencing hearing . . . absolutely nothing was added in mitigation by the defense which would have argued for anything less than the death penalty. . . . [T]he defense did not present any defense at the sentencing hearing . . . . [T]here really was not any mitigation to work with." *Id.* (Page ID #5130). Jury Foreperson Nichole Mikesell stated that the "[j]urors made a concerted effort to find at least one mitigating factor but there wasn't any." *Id.* (Page ID #5131). "She, and the other jurors, wanted corroboration from other witnesses at the sentencing hearing regarding something of a positive aspect regarding Jeronique." *Id.*

interviews make plain that Cunningham's penalty-phase case was eviscerated by defense counsel's failure to furnish much-needed detail and corroboration about the extent to which Cunningham was abused and about how Cunningham had to look after his siblings. *Id.*

In *Wiggins*, defense counsel had "*some* information" about Wiggins's background from the presentence investigation report and Baltimore's social-services department's records. *Wiggins*, 539 U.S. at 527, 524. The Court concluded that the scope of investigation was unreasonable partially because of the contents of the social-services records. *Id.* at 525. In *Wiggins*, the social-services records revealed that—

> [Wiggins's] mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food.

*Id.* Yet at sentencing, Wiggins's counsel merely "told the jury it would 'hear that Kevin Wiggins has had a difficult life[.]'" *Id.* at 526 (citation omitted). "At no point did [defense counsel] proffer *any* evidence of [Wiggins's] life history or family background. *Id.* at 516 (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 381–82, 387 (2005) (concluding that defense counsel must obtain records containing information that the State has and will use against defendant even when defendant was "actively obstructive" and "sen[t] counsel off on false leads" and defense counsel spoke with five members of defendant's family and three mental-health witnesses).

Cunningham's case is akin to but not quite *Wiggins*. The contents of the social-services records in *Wiggins* parallel the revelations in the children-services records in the present case. Here, children services thoroughly documented how Betty abused substances; how she starved, abandoned, beat, and neglected her children; and the many times Cunningham was placed with his grandmother, aunt, and foster homes. Unlike Wiggins's lawyer, however, Cunningham's counsel introduced *some* personal history through Tarra's, Betty's, and Davis's testimony, most of which overlapped with or, in Davis's case, was drawn from the children-services records. That fact distinguishes Cunningham's lawyer from Wiggins's lawyer, who presented *no* mitigating evidence about Wiggins's background to back up her penalty-phase statement that Wiggins had a difficult life.

What does this mean for Cunningham?  To us, Cunningham's trial counsel's performance during the penalty phase was clearly constitutionally deficient and prejudicial.  The Ohio Court of Appeals nonetheless held that defense counsel did not perform ineffectively.  Applying the harsh standards of AEDPA as elaborated by the Court, *Richter*, 562 U.S. at 102, we cannot say that the Ohio Court of Appeals unreasonably applied the Court's ineffective-assistance-of-counsel precedent.  We cannot grant Cunningham habeas relief for this claim.

### III.  ISSUE #4:  INEFFECTIVE COUNSEL AT GUILT PHASE

Cunningham argues that his trial counsel provided ineffective assistance in failing to obtain and present testimony from a ballistics expert.  We disagree.

Because no weapons were recovered from the scene of the crime, *see Cunningham I*, 2004 WL 2496525, at *6, eyewitnesses and experts supplied the sole evidence about who shot whom with what.  The trial court granted defense counsel funds to hire a ballistics expert. R. 194-1 (Trial Tr. at 4–8) (Page ID #8847–51).

Five survivors of the shooting—Dwight Goodloe, Coron Liles, Loyshane Liles, Tomeaka Grant, and James Grant—testified that Cunningham was armed with a revolver, that Jackson wielded a semiautomatic, and that both Cunningham and Jackson shot persons.  R. 194-2 (Trial Tr. at 1027–28, 1052–59, 1121–22, 1129–33, 1143, 1153–54, 1175–76, 1195, 1222–27, 1278–88) (Page ID #10216–17, 10241–48, 10317–18, 10325–29, 10339, 10349–50, 10371–72, 10391, 10418–23, 10482–92).  Coron Liles attested that he spat out a bullet a few blocks from the crime scene; the bullet was never recovered by law enforcement.  Tomeaka Grant swore that a bullet remained lodged in her arm; the caliber of that bullet is unknown.  *Id.* at 1133, 1226 (Page ID #10329, 10422); *Cunningham I*, 2004 WL 2496525, at *8.

At trial, Ohio called two experts:  John Heile, a forensic scientist with Ohio's Bureau of Criminal Investigation and Identification, and Cynthia Beisser, a coroner.  Heile testified that all the recovered cartridges and most of the recovered bullets were .380 caliber and fired from the same pistol.  Point 380 caliber casings are typically fired by a semiautomatic—not a revolver. R. 194-2 (Trial Tr. at 1066–67, 1071–74) (Page ID #10262–63, 10267–70).  A damaged bullet and a damaged lead core shared the characteristics of .380 caliber bullets, Heile attested.  *Id.* at

1075–76 (Page ID #10271–72). But Heile could not conclusively state that these two nonintact bullets were fired from the same weapon as the other recovered bullets. *See id.* Because no weapons were located, Heile penned a report that listed the guns that could have fired the recovered bullets. Only semiautomatics made the list—no revolvers. *Id.* at 1076–77 (Page ID #10272–73). On cross-examination, Heile testified that .380 cartridges could fit into a .38 caliber revolver but that the revolver would probably not fire. Heile also attested that .380 cartridges would not fire in a .44 caliber revolver without alterations to the gun. *Id.* at 1082–84 (Page ID #10278–80).

Beisser autopsied the two murder victims, Leneshia Williams and Jala Grant, who had died of gunshot wounds to the head. *Id.* at 1252–54 (Page ID #10456–58). Based on her examination, Beisser could not determine the caliber of the bullets that entered Williams and Grant. *Id.* at 1257 (Page ID #10461). Skin, Beisser explained, is elastic; a hole in skin is not the same size as the projectile that penetrates the skin. *Id.* On cross-examination, Beisser testified that a .380 caliber pistol could leave entrance wounds of the size found on the victims but that the wounds were also consistent with other different-caliber weapons. *Id.* at 1265–70 (Page ID #10469–74). On redirect and re-cross-examination, Beisser repeatedly testified that .380 and .38 caliber bullets are the same size. *Id.* at 1271–72 (Page ID #10475–76).

Instead of summoning a ballistics expert, defense counsel called gun-shop owner William Danny Reiff. Reiff testified that .44 caliber revolvers and bullets are much larger than .380 caliber pistols and bullets. R. 194-2 (Trial Tr. at 1363–64) (Page ID #10567–68). On cross-examination, Reiff testified that .38, .357, .380, and .9 caliber cartridges are the same diameter and are indistinguishable to lay persons. *Id.* at 1366–69 (Page ID #10570–73).

In his state postconviction petition, Cunningham asserted that his trial counsel ineffectively failed to obtain and present testimony from a ballistics expert. Cunningham lambasted Reiff's rebuttal. To clarify that Cunningham could not have fired a .380 caliber cartridge in any of the weapons suggested by Heile, Cunningham asserted, defense counsel should have shown the jury a video of .380 caliber cartridges being placed into different caliber revolvers and fired. R. 192-4 (2003 Postconviction Pet.) (Page ID #5069–72, 5077–80). The Ohio Court of Appeals rejected Cunningham's assertions on the merits. *See Cunningham I,*

2004 WL 2496525, at *6–8.  Cunningham restated his claim in his federal habeas petition. R. 19-6 (Habeas Pet. at 61–67) (Page ID #129–35); Appellant's Br. #1 at 128–29.

According § 2254(d)(1) deference to the Ohio Court of Appeals, we assess whether defense counsel performed deficiently and prejudicially.  *See Strickland*, 466 U.S. at 687, 691. Perhaps a ballistics expert would have been more convincing than Reiff had been.  But trial counsel pushed the theory that Cunningham did not fire any weapon on the night of the murder while questioning all three experts.  Indeed, Heile's and Beisser's testimony favored Cunningham's theory.  Heile conveyed that no evidence indicated that a revolver fired the bullets and casings recovered; and Beisser insisted that she could not determine the caliber of the gun that caused the victims' entrance wounds.  Multiple eyewitnesses, on the other hand, testified that they saw Cunningham shoot persons.  Cunningham does not explain in either his postconviction petition or his brief how a ballistics expert's testimony would have affected the evidence elicited at trial or altered the outcome of the case.  Without evidence of prejudice, we deny relief on Cunningham's fourth claim.

## IV.  ISSUE #5:  VOIR DIRE

We also reject Cunningham's argument that the trial court improperly constrained defense counsel's latitude to question prospective jurors about their willingness to consider specific mitigating factors.

At trial, the court allowed Cunningham's lawyer to question members of the venire about whether they would automatically vote for the death penalty and whether they were willing to consider fairly all mitigating factors, sentencing options, and available evidence.  R. 194-1 (Trial Tr. at 327–31) (Page ID #9502–06).  The trial court, however, barred defense counsel from asking the prospective jurors about the type of mitigating factors that they would consider in voting against the death penalty.  *Id.* at 422–25 (Page ID #9597–600).

On direct appeal, Cunningham argued that the trial court's restrictions on questioning likely resulted in the seating of a juror who would automatically impose the death penalty.  *See Cunningham II*, 824 N.E.2d at 513.  The Ohio Supreme Court concluded that defense counsel waived this argument "by failing to challenge any seated juror's views on capital punishment."

*Id.* The state high court also rejected Cunningham's claim as meritless. *See id.* at 513–14. Cunningham reraised this claim in his federal habeas petition. R. 19-3 (Habeas Pet. at 23) (Page ID #85).

Because the Ohio Supreme Court failed to clearly and expressly rely on a procedural bar, any procedural default is excused. *See Harris v. Reed*, 489 U.S. 255, 263 (1989). Extending § 2254(d)(1) deference to the state high court's merits decision, we reject Cunningham's argument. Trial courts must ensure that jurors will not automatically vote for the death penalty. *See Morgan v. Illinois*, 504 U.S. 719, 729, 734–36 (1992). Others have argued to this court that a trial judge violates this constitutional precept when they prohibit questions about specific mitigating factors during voir dire. *See Hodges v. Colson*, 727 F.3d 517, 528–29 (6th Cir. 2013); *Bedford v. Collins*, 567 F.3d 225, 232–33 (6th Cir. 2009); *Dennis v. Mitchell*, 354 F.3d 511, 523–25 (6th Cir. 2003). Just as we rejected that argument in those habeas cases, we do not grant relief to Cunningham here.

## V.  ISSUE #6:  JURY INSTUCTIONS

Cunningham has procedurally defaulted his argument that the trial court neglected to instruct the jury that it must determine Cunningham's personal culpability before imposing a death sentence. We cannot review this claim.

Under Ohio Supreme Court Rule of Practice 11.06(A), capital defendants may apply to reopen their case within ninety days of the Ohio Supreme Court's issuance of a mandate. Those who show good cause are exempted from the ninety-day deadline. *See* OHIO S. CT. PRAC. R. 11.06(A).

In his 2006 federal habeas petition, Cunningham asserted for the first time that the trial court violated the *Apprendi v. New Jersey*, 530 U.S. 466 (2000), line of cases by failing to instruct the jury that Cunningham must possess the requisite personal responsibility to be eligible for the death penalty. R. 19-10 (Habeas Pet. at 123, 144–45) (Page ID #190, 211–12). On April 23, 2007—as federal habeas proceedings unfolded—the Ohio Supreme Court appointed counsel to apply to reopen Cunningham's case under Rule 11.06(A). *See* R. 51 (1/11/07 Mot.) (Page ID #644); R. 55 (2/8/07 Order at 1–2) (Page ID #738–39); R. 59-1 (Reopen App.) (Page ID #749).

Cunningham reasserted that the jury instructions violated *Apprendi* and its progeny. R. 59-1 (Reopen App.) (Page ID #866–69). Cunningham conceded that he had surpassed the ninety-day deadline, but he argued that his applying to reopen his case within ninety days of appointment of counsel satisfied good cause. *Id.* at 2 (Page ID #750); Appellant's Br. #1 at 44. In a single-sentence order, the Ohio Supreme Court rejected Cunningham's application, reasoning that Cunningham failed to comply with the rule's ninety-day filing deadline. The state high court said nothing about good cause. *State v. Cunningham*, 872 N.E.2d 946 (Ohio 2007) (Table).

Cunningham has procedurally defaulted this claim. The Ohio courts have firmly established the meaning of "good cause" and regularly follow the ninety-day deadline. *Wogenstahl v. Mitchell*, 668 F.3d 307, 322 (6th Cir. 2012).[15] Thus, Rule 11.06(A) constitutes an independent and adequate state ground for procedural default, which the Ohio Supreme Court enforced in this case. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). Cunningham correctly points out that postconviction counsel's ineffective performance can establish cause to excuse a procedural default in certain circumstances. *See* Appellant's Br. #1 at 48; *Martinez v. Ryan*, 566 U.S. 1, 13–14 (2012); *Trevino v. Thaler*, 569 U.S. 413, 417 (2013). But Cunningham has not explained *why* his postconviction counsel was deficient or prejudicial. *See* Appellant's Br. #1 at 49. We have nothing to base an ineffective-counsel decision on. To that end, we cannot excuse Cunningham's procedural default, and we cannot review this claim.

## VI. ISSUE #7: BRADY

Cunningham argues that Ohio violated *Brady* by failing timely to turn over police interviews of two testifying witnesses. We conclude that this claim is partially procedurally defaulted and partially meritless.

At trial, eyewitnesses Dwight Goodloe and James Grant testified. Defense counsel moved the trial court to review in camera a police report summarizing an interview with

---

[15]*Wogenstahl* addresses Ohio Rule of Appellate Procedure 26(B), not Rule 11.06(A). *See Wogenstahl*, 668 F.3d at 322. Rule 26(B) governs applications to reopen filed by defendants in all criminal cases, not just defendants in death-penalty cases. *See* OHIO APP. R. 26(B). The provisions are otherwise identical; they include the same ninety-day limit. *Compare id.*, *with* OHIO S. CT. PRAC. R. 11.06(A). We therefore apply *Wogenstahl*'s analysis to this case.

Goodloe, R. 192-4 (Goodloe Rep.) (Page ID #5295–97), and two police reports memorializing interviews with Grant, *id.* (Grant Reps.) (Page ID #5140–50). Finding that Goodloe had testified consistently with his interview, the trial court did not supply the Goodloe report to defense counsel. R. 194-2 (Trial Tr. at 1037) (Page ID #10226). The trial court, however, found sufficient differences between Grant's testimony and his interviews and allowed the defense to use the reports during cross-examination. *Id.* at 1296 (Page ID #10500). Defense counsel, however, never mentioned the Grant reports during cross. *Id.* at 1298–305 (Page ID #10502–09).

In his state postconviction petition, Cunningham cited *Brady* in two claims for relief; he assailed Ohio for failing to turn over the Goodloe and Grant reports ahead of trial. Cunningham explained that defense counsel could have used the interviews to impeach or undermine Goodloe and Grant. R. 192-4 (2003 Postconviction Pet.) (Page ID #5072–74, 5083–85). The Ohio Court of Appeals concluded that res judicata prevented it from reviewing Cunningham's *Brady* arguments. *See Cunningham*, 2004 WL 2496525, at *12. The state appellate court reasoned that these *Brady* subclaims could have been fairly determined within the confines of the trial record and thus should have been raised on direct appeal. *See id.* Alternatively, the Ohio Court of Appeals concluded, the *Brady* claims were meritless. *See id.* at *11–12. Cunningham preserved his two *Brady* subclaims in his federal habeas petition. R. 19-5 (Habeas Pet. at 53) (Page ID #100).

In his postconviction petition, Cunningham supplied two attachments for his argument that the State improperly withheld the Goodloe report—the report itself and Goodloe's testimony at trial. R. 192-4 (2003 Postconviction Pet.) (Page ID #5074, 5109, 5135–36, 5295–97). Because this subclaim was based solely on the trial record, the Ohio Court of Appeals correctly invoked res judicata in refusing to hear this subclaim. *See Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005).

We reach a different conclusion for the Grant subclaim. To support this claim, Cunningham attached to his postconviction petition the two Grant reports and Grant's testimony at trial. These, of course, were part of the trial record. R. 192-4 (2003 Postconviction Pet.) (Page ID #5085, 5109, 5140–50). But Cunningham also attached Jackson's investigator's report,

which, again, was generated posttrial. That report laid out postverdict interviews with six jurors and an alternate, several of whom stated that Grant's testimony swayed them to convict. *Id.* (Page ID #5085, 5109, 5121–32; 5140–50). Because Cunningham relied on evidence outside the trial record for this subclaim, the Ohio Court of Appeals incorrectly invoked res judicata in refusing to consider Cunningham's assertion about the Grant reports. We may therefore review the merits of this subclaim. *See Hill*, 400 F.3d at 314. We apply § 2254(d)(1) deference to the Ohio Court of Appeals's merits decision.

The State violates the Constitution when it withholds evidence favorable to a defendant that is material to his guilt or punishment. *See Brady*, 373 U.S. at 87; *see also United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994). A delay in turning over evidence contravenes *Brady* only if the delay itself is prejudicial. *See Bencs*, 28 F.3d at 561. Here, the prosecution *did* produce the Grant reports; any prejudice arose from the timing of the handover. Even though defense counsel may have been better prepared to cross-examine Grant had the reports been turned over before (rather than during) trial, Cunningham's lawyer failed to request a continuance to review the reports. *Cf. Joseph v. Coyle*, 469 F.3d 441, 472 (6th Cir. 2006). Indeed, when the trial court asked defense counsel if he was ready to cross-examine Grant, the lawyer answered in the affirmative. R. 194-2 (Trial Tr. at 1296) (Page ID #10500). Given these circumstances, we cannot conclude that the delay prejudiced Cunningham.

## VII. ISSUE #8: PROSECUTOR'S STATEMENTS

Cunningham argues that the prosecutor made five improper statements. Cunningham defaulted his claims about three of the statements, so we cannot consider them. The Ohio Supreme Court's decision about the remaining two statements, moreover, involved no unreasonable application of Supreme Court precedent. We thus reject Cunningham's final argument.

Cunningham takes issue with five of the prosecutor's statements—three from the prosecutor's closing argument at the guilt phase and two from his closing argument at the sentencing phase. The first statement arose from a back-and-forth about bullets at the closing of the guilt phase. Defense counsel conveyed that the physical evidence showed that just one gun

was used and that Jackson—not Cunningham—fired that weapon. R. 194-2 (Trial Tr. at 1440) (Page ID #10650). The prosecutor responded by speculating that Cunningham could have fired bullets that were lost in the blood at the crime scene or disintegrated when they hit a wall. *Id.* at 1441–43 (Page ID #10651–53). Second, the prosecutor stated during the guilt phase that Grant, the three-year-old murder victim, never received a chance for justice. *Id.* at 1448 (Page ID #10658). Third, the prosecutor commented at the guilt phase that the killings were "absolutely the most cold-blooded calculated inhumane murder that anyone could ever imagine." *Id.* at 1449 (Page ID #10658). Fourth, the prosecutor mentioned that Cunningham made an unsworn statement during the penalty phase that was not subject to cross-examination, which did not "lessen his moral culpability" or "diminish the appropriateness of the death sentence." *Id.* at 116 (Page ID #10849). Fifth, the prosecutor conveyed during the penalty phase that Cunningham's unsworn statement; malingering, antisocial-personality, and psychopathic-personality diagnoses; comprehension of right and wrong; and lack of progress in treatment should not mitigate Cunningham's sentence. *Id.* at 116–17 (Page ID #10849–50). Cunningham frames these statements as the prosecutor's impermissibly listing out nonstatutory aggravating factors. *See* Appellant's Br. #1 at 85.

Cunningham argued on direct appeal that these five statements were improper. Highlighting that Cunningham's trial counsel had objected at trial to the third and fourth statements but not to the first, second, and fifth statements, the Ohio Supreme Court reviewed for plain error the latter trio of comments. The state high court rejected Cunningham's argument on the merits, concluding that none of the five statements were improper. *Cunningham II*, 824 N.E.2d at 523–24. Cunningham preserved all five subarguments in his federal habeas petition. R. 19-7 (Habeas Pet. at 68) (Page ID #111).

We cannot review the first, second, and fifth statements because they have been procedurally defaulted. The Ohio courts' enforcement of the contemporaneous-objection rule is an independent and adequate ground that bars habeas relief. *See Hand v. Houk*, 871 F.3d 390, 417 (6th Cir. 2017). That the Ohio Supreme Court reviewed the merits of three of Cunningham's allegations for plain error does not waive Ohio's procedural-default rules. *See id.* So we cannot review these three statements unless the default is excused. *See id.*

Cunningham argues that his trial counsel's ineffective performance served as cause and prejudice to excuse his defaulting this trifecta of statements. Appellant's Br. #1 at 85–86. But Cunningham has not established prejudice. The first statement—the speculation about the unfound bullets—was not prejudicial. The jury heard that one bullet was dug out of a wall and a bullet fragment was discovered in a pool of blood. R. 194-2 (Trial Tr. at 966–71) (Page ID #10155–60). A police officer also testified that law enforcement recovered a tooth and jewelry while fishing through pools of blood with a pen. *Id.* at 957–58 (Page ID #10146–47). Again, Coron Liles spat out an unrecovered bullet in the streets; another bullet remains lodged in Tomeaka Grant's arm. *Id.* at 1133, 1226 (Page ID #10329, 10422); *Cunningham I*, 2004 WL 2496525, at *8. Put another way, other evidence indicated that bullets fired from Cunningham's weapon may have fragmented, been overlooked in blood pools, or otherwise been lost. So the prosecutor's speculations were not prejudicial. No doubt, the prosecutor's second statement— that Grant never received a chance at justice—wrongfully inflamed the passions and prejudices of the jury. *See Wogenstahl*, 668 F.3d at 333. But this comment was isolated and therefore harmless. *See id.* at 333–34. As for Cunningham's fifth allegation, we are not convinced that the prosecutor's description of the mitigating evidence constituted a list of nonstatutory aggravating factors. Either way, the Constitution allows juries to consider nonstatutory aggravating factors. *See LaMar v. Houk*, 798 F.3d 405, 431 (6th Cir. 2015). Because this troika of statements did not prejudice Cunningham, his procedural default is unexcused. We cannot address the merits of these claims.

We can, however, review the merits of the two nondefaulted subclaims; we apply § 2254(d)(1) deference to the Ohio Supreme Court's consideration of the prosecutor's third and fourth statements. The prosecutor's third statement—that this was "absolutely the most cold-blooded calculated inhumane murder that anyone could ever imagine," R. 194-2 (Trial Tr. at 1449) (Page ID #10658)—was improperly designed to inflame the jury's passion, *see Gumm v. Mitchell*, 775 F.3d 345, 377 (6th Cir. 2014). If we were directly reviewing Cunningham's case, he may be entitled to relief. *See id.* But this is a habeas case. To attain habeas relief, Cunningham must show that the prosecutor's statements were "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant"—a high standard to surpass. *Hartman v. Bagley*, 492 F.3d 347, 367 (6th Cir. 2007)

(quoting *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000)).  In deciding that the third statement was harmless, the Ohio Supreme Court did not unreasonably apply Supreme Court precedent.

The prosecutor's fourth statement—that Cunningham testified sans oath—violated Ohio law.  *See Bedford v. Collins*, 567 F.3d 225, 236 (6th Cir. 2009) (explaining that Ohio law provides that the prosecution may not disparage a defendant's decision not to testify under oath).  But the Supreme Court has never addressed whether the Constitution is implicated when a state-law right to supply unsworn testimony is violated.  Absent such precedent, the Ohio Supreme Court's single-sentence postcard denial—"[w]e reject this argument," *Cunningham II*, 824 N.E.2d at 524—involved no unreasonable application of Supreme Court caselaw.  *See Richter*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

In short, Cunningham's argument that the prosecutor made improper statements is partially defaulted and partially meritless.  We thus reject this argument.

## VIII. CONCLUSION

We **REVERSE** and **REMAND** so that the district court can conduct an evidentiary hearing to investigate Cunningham's two juror-bias claims consistent with this opinion.

---

**CONCURRING IN THE JUDGMENT IN PART AND DISSENTING IN PART**

---

KETHLEDGE, Circuit Judge, concurring in the judgment in part and dissenting in part. What the majority calls "the harsh standards of AEDPA as elaborated by the [Supreme] Court," Op. at 41, are standards that bind us nonetheless. Here, the majority orders habeas relief based on our own precedents, rather than those of the Supreme Court—an error for which the Court has already reversed us more than once. The majority also orders the district court to conduct an evidentiary hearing on the basis of post-trial testimony about jury deliberations—which Federal Rule of Evidence 606(b) presumptively bars a federal court from even "receiv[ing.]" As to those holdings, I respectfully dissent.

I.

The background facts deserve mention here. During the afternoon of January 3, 2002, Cunningham bought crack cocaine from Shane Liles at Liles's apartment in Lima, Ohio. That evening, Cunningham and Cleveland Jackson—armed with a revolver and pistol, respectively— returned to Liles's apartment to rob him. When they arrived, Liles was not home; instead, they found several of his friends and family members. Liles's girlfriend, Tomeaka Grant, called Liles to tell him he had visitors. Cunningham and Jackson waited for Liles in the living room, where teenagers Leneshia Williams, Coron Liles, and Dwight Goodloe Jr. were talking and watching "The Fast and the Furious." Tomeaka Grant returned to the kitchen, where she had been playing cards with her brother, James Grant, and a family friend, Armetta Robinson. Grant had stopped by with his three-year-old daughter Jala to pick up a vacuum cleaner.

Shane Liles soon arrived home, and Cunningham told him that Jackson wanted to purchase drugs. Liles and Jackson discussed the sale on the staircase near the living room, while Cunningham remained on the couch with the teens. Then Cunningham stood up and ordered the teens into the kitchen. When Coron hesitated, Cunningham struck him in the face with the barrel of his gun, breaking Coron's jaw. Coron ran into the kitchen crying; Cunningham followed, rounding up the other two teens and forcing them at gunpoint into the kitchen, where they joined

Tomeaka, James, and Jala Grant, along with Armetta Robinson. The group tried to shield themselves with a table, but Cunningham pushed it away and locked the back door.

Meanwhile, Jackson pulled a gun on Shane Liles and walked him upstairs, demanding drugs and money. Jackson then tied Liles's hands behind his back and forced him into the kitchen, where the rest of the group was huddled, crying and pleading. James Grant held his daughter, three-year-old Jala, in his lap. Jackson and Cunningham demanded that everyone place any valuables on the table; when Shane Liles said he had none left, Jackson shot him in the back. Almost immediately, Cunningham and Jackson started firing into the rest of the group—"aiming towards like the middle, at the ends and coming in . . . one from one side, one from the other." The victims saw smoke and sparks from Cunningham's gun and heard the "click, click, click" of empty weapons as Jackson and Cunningham continued to pull the triggers, even after they were out of bullets.

Every member of the group was shot. Seventeen-year-old Leneshia Williams was shot in the back of her head, killing her almost instantly. Goodloe saw Coron's head "snap back" when Cunningham shot him in the mouth. Armetta Robinson was shot in the back of her head and comatose for 47 days. Tomeaka Grant was shot in the head and arm and lost her left eye. James Grant was shot five times, including in his face, as he tried to shield Jala. His efforts were unsuccessful: Jala was shot twice in the head and died on the kitchen floor. Cunningham and Jackson fled and discarded the murder weapons, which were never recovered.

\*    \*    \*

As a juror in Cunningham's trial, Nichole Mikesell heard detailed testimony regarding the facts described above—including testimony by James Grant about how he begged for his daughter's life before she was shot. The jury convicted Cunningham and recommended a sentence of death, which the trial judge imposed.

II.

A.

One weekend afternoon about a year after the trial, investigator Gary Ericson showed up uninvited at Mikesell's home while she was playing outside with her kids. Ericson's summary of that interview is the basis of Cunningham's first claim of juror bias, on which the majority now grants relief.

That claim, as the majority describes it, is that "Mikesell's social-worker colleagues fed her information about Cunningham." Op. at 12. That description substantially embellishes what the summary itself says. As an initial matter, the majority asserts that Mikesell's "statement" to Ericson "indicated bias against Cunningham." Op. at 17. But of course it did: the interview came a year after Mikesell had heard chapter and verse about how Cunningham rounded up and then helped to shoot eight people in Shane Liles's kitchen. By then—after Mikesell and every other juror had voted to convict Cunningham and recommended a sentence of death—it was Mikesell's prerogative to think that Cunningham was "an evil person" with "no redeeming qualities." Jurors must be impartial before they render a verdict, not after.

The only assertion in Ericson's summary that matters—as the state court of appeals correctly observed—was his assertion that Mikesell had said that "some social workers worked with Jeronique in the past and were afraid of him." That assertion was not enough, the state court held, to require the trial court to hold an evidentiary hearing as to whether Mikesell had been an impartial juror the year before. The question now is whether that decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The answer to that question depends on the showing necessary to mandate—as a matter of constitutional due process—an evidentiary hearing regarding a juror's partiality. On habeas review, we determine that answer only by reference to "clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d). Here, the relevant Supreme Court case is *Remmer v. United States*, 347 U.S. 227 (1954), in which a juror

alleged mid-trial that he had been offered a bribe to acquit the defendant. That allegation, coupled with an FBI agent's follow-up visit to the juror while the trial was still underway, mandated an evidentiary "hearing with all interested parties permitted to participate." *Id.* at 230. The majority thinks this case is so obviously similar to *Remmer* that the state court's decision not to hold an evidentiary hearing was "an unreasonable application of *Remmer*." Op. at 15.

But the only obvious error here is the majority's own. The majority says that, "[t]o receive a *Remmer* hearing, Cunningham had to *colorably allege* that the jury encountered extraneous influence—which he did in his state postconviction petition." Op. at 14 (emphasis added). But the rule that the majority applies to this claim—that upon a "colorable" allegation of juror bias, the trial court must hold an evidentiary hearing to investigate the matter further— appears in no holding "by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d). Instead that rule comes from our own direct-review cases, notably *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999). And we cannot grant habeas relief based upon our own constitutional precedents, which is what the majority does today. For this particular trespass the Supreme Court has already reversed us at least twice: "As we explained in correcting an identical error by the Sixth Circuit two Terms ago, circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (cleaned up). Thus, the Court held, "it was plain and repetitive error for the Sixth Circuit to rely on its own precedents in granting [] habeas relief." *Id.* at 49. Yet here the majority repeats the same error again.

A lawful resolution of Cunningham's claim would begin with the Supreme Court's recognition that, "[w]hen assessing whether a state court's application of federal law is unreasonable, the range of reasonable judgment can depend in part on the nature of the relevant rule that the state court must apply." *Renico v. Lett*, 559 U.S. 766, 776 (2010) (internal quotation marks omitted). Specifically, "the more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations." *Id.*

Under that framework, the Ohio Court of Appeals had maximum leeway when adjudicating the claim at issue here. For as to the showing necessary to mandate an evidentiary hearing regarding potential juror bias, the Supreme Court's holdings provided the Ohio court with scarcely any guidance at all. In *Remmer* itself, the Court made no attempt to describe, qualitatively or quantitatively, the showing necessary to mandate the evidentiary hearing that the majority says was so plainly mandated here. Instead the Court said this: "The trial court should not decide and take final action ex parte *on information such as was received in this case*, but should determine the circumstances, the impact thereof on the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." 347 U.S. at 229-30 (emphasis added).

That holding provided not a rule but a data point: the Court said that a hearing was necessary on the facts of that case, but did not state a principle of general application as to why. The Ohio courts were thus left to compare the facts of this case to the facts of *Remmer* when deciding whether to order a hearing. And a fairminded jurist could easily conclude that the facts here were materially different than the facts there. In *Remmer*, two facts were critical. The first, as noted above, was that, during trial, a juror reported to the judge that a third party had offered the juror what appeared to have been a bribe to vote in favor of acquittal. That amounted to an allegation of "tampering directly or indirectly with a juror during a trial about the matter pending before the jury[,]" which, if true, the Court deemed "presumptively prejudicial." *Id*. at 229. The second critical fact was that, after the juror reported the apparent bribe to the judge, an FBI agent visited the juror to inquire about it, again while the trial was still pending. *Id*. at 228. As to the latter fact, the Court said: "The sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly." *Id*. at 229. These two facts combined were the "information such as was received in this case" that mandated a hearing in *Remmer*. *Id.* at 229-230.

We have nothing of the sort for the claim here. What we have, rather, is an allegation that, a year after trial, Mikesell knew that some of her colleagues were afraid of Cunningham. That allegation, taken as true, is not nearly as prejudicial on its face as the bribery allegation in *Remmer* was. Instead, as the Ohio Court of Appeals recognized, the allegation requires a degree

of speculation—about whether Mikesell obtained that putative knowledge in the twelve months after trial rather than before, and about the extent to which that knowledge was actually prejudicial—that the allegation in *Remmer*, taken as true, did not. A fairminded jurist could therefore conclude that *Remmer*'s presumption of prejudice did not apply here. Nor does the record for this claim include anything like an FBI agent's mid-trial visit to a juror recently offered a bribe to acquit. Thus, a fairminded jurist could conclude—I think likely would conclude—that the information received here was less suggestive of prejudice than the "information such as was received" in *Remmer*. *Id*. at 229-30.

Meanwhile, in the 60-odd years since *Remmer*, the Supreme Court has not ordered a *Remmer* hearing even once. (The majority's reliance on *Smith v. Phillips*, 455 U.S. 209 (1982), is misplaced: that case did not even present the question whether to order a *Remmer* hearing. *See id.* at 217.) Thus, as to the Supreme Court's own precedents, the facts of *Remmer* itself remain the only source of guidance as to the showing necessary to mandate a *Remmer* hearing. And those facts are quite different from those here. No precedent of the Supreme Court, therefore, would compel every fairminded jurist to hold that a *Remmer* hearing was mandatory as to Cunningham's first claim of juror bias. The majority misapplies § 2254(d) when it grants the writ as to that claim.

B.

The majority likewise orders a hearing as to Cunningham's second claim of juror bias, which the Ohio Court of Appeals held was procedurally barred. We therefore review that claim de novo. *Coley v. Bagley*, 706 F.3d 741, 749 (6th Cir. 2013).

As an initial matter, I think that Cunningham has established diligence for purposes of seeking an evidentiary hearing (as opposed to substantive relief) on this claim. The claim itself centers on allegations that, during deliberations, Mikesell told other jurors that she knew the victims' families. Cunningham first became aware of the grounds for this claim, such as they are, when his own investigator interviewed jurors Staci Freeman and Roberta Wobler in late 2008. Cunningham then sought written discovery and an evidentiary hearing in federal and then state court. Under Supreme Court precedent, those efforts are enough to establish Cunningham's

diligence for purposes of the habeas statute. *See* 28 U.S.C. § 2254(e)(2); *Williams v. Taylor*, 529 U.S. 420, 437 (2000). Those same efforts support a determination of cause (though not prejudice) for purposes of his procedural default of this claim. *Id*. at 444.

That leaves the question whether Cunningham has made the substantive showing necessary to obtain a hearing as to this claim. But a threshold question is evidentiary: whether, as the district court held, the evidence on which Cunningham based this claim was itself barred by the longstanding "rule against admission of jury testimony to impeach a verdict[.]" *Tanner v. United States*, 483 U.S. 107, 121 (1987). I think the district court was right on this point.

"[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." *Id*. at 127. As this case itself illustrates, if jury deliberations were open to examination upon every *post hoc* claim of misconduct or bias, "[j]urors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *Id*. at 120. Thus, by the early 20th century, "the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a verdict." *Id*. at 117. That rule is codified today in Federal Rule of Evidence 606(b), which provides in full:

> (1) *Prohibited Testimony or Other Evidence*. During an inquiry into the validity of a verdict or indictment, *a juror may not testify about* any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. *The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.*
>
> (2) *Exceptions*. A juror may testify about whether:
>
> (A) extraneous prejudicial information was improperly brought to the jury's attention;
>
> (B) an outside influence was improperly brought to bear on any juror; or
>
> (C) a mistake was made in entering the verdict on the verdict form.

(Emphasis added.)

The testimony on which Cunningham based his second claim of juror bias ran directly into the headwinds of this rule. That testimony took the form of affidavits and deposition

testimony by Roberta Wobler and Staci Freeman, both of whom were jurors at his trial. And virtually all that testimony concerned matters within the jury's deliberations, which means that—subject to the exceptions in Rule 606(b)(2)—the district court presumptively could not even "*receive*" these jurors' "affidavits and evidence[.]" Fed. R. Evid. 606(b)(1) (emphasis added). Yet the majority proceeds not only to receive all that evidence but to order a hearing based upon it.

Most of the testimony that the majority cites from these witnesses—*e.g.*, Freeman's testimony that she and "other people in the [jury] room felt pressured[,]" that Mikesell "was very domineering[,]" that Freeman "was the last one holding out," that "I felt the sense in the room, I felt the pressure," Mikesell "tried to steer everyone," and so on—was patently barred under the plain terms of Rule 606(b)(1). That testimony was the archetype of evidence that the Rule precludes jurors from offering and courts from receiving. That testimony was pedestrian as well: jurors commonly "assert after the fact that other jurors pressured them into their verdict." *United States v. Brooks*, 987 F.3d 593, 604 (6th Cir. 2021); *see also, e.g., United States v. Lloyd*, 462 F.3d 510, 519 (6th Cir. 2006) (district court properly declined to receive post-trial testimony that a juror "could no longer stand the pressure from other jurors"); *United States v. Tallman*, 952 F.2d 164, 167 (8th Cir. 1991) ("To admit proof of contentiousness and conflict to impeach a verdict under Rule 606(b) would be to eviscerate the rule").

The only testimony that was even arguably proper under Rule 606(b) concerned Mikesell's putative relationships with the victims' families—an issue that easily could have been covered in voir dire. Wobler testified in her deposition that during "deliberations [Mikesell] stated she may in the future be working with the families under the Welfare Job and Family Services where she worked." Freeman testified in her deposition that, during deliberations, Mikesell said "she dealt with the victims and their families, they knew who she was, and that if she would find him not guilty that she would have to deal with them and that's just something she didn't want to have to deal with because of who she was."

The question, then, is whether this subset of testimony fell within an exception to Rule 606(b)'s bar on juror testimony concerning statements made during deliberations. The relevant

exceptions are those in Rule 606(b)(2)(A) and (B)—whose differences the caselaw sometimes blurs by conflating them into one.

Rule 606(b)(2)(A) concerns certain "information"; Rule 606(b)(2)(B), certain "influences." "[E]xtraneous prejudicial information[,]" within the meaning of Rule 606(b)(2)(A), includes "publicity and information *related specifically to the case* the jurors are meant to decide[.]" *Warger v. Shauers*, 574 U.S. 40, 51 (2014) (emphasis added). That kind of information bears directly on the facts the jury must find (which one might call "substantive extraneous information") or on the jury's assessment of a witness's credibility (which one might call "impeachment extraneous information"). That a juror's daughter was involved in an accident similar to the accident at issue at trial, for example, did not provide that juror with "extraneous prejudicial information" within the meaning of the rule—because the prior accident "did not provide either her or the rest of the jury with any specific knowledge regarding [the defendant's] collision with [the plaintiff]." *Id*. at 52. By contrast, "news reports *of the case being decided by the jurors*" would be extraneous prejudicial information under Rule 606(b)(2)(A). *Thompson v. Parker*, 867 F.3d 641, 648 (6th Cir. 2017). So too would a juror's past dealings with a party or witness, which "taints the deliberations with information not subject to a trial's procedural safeguards." *United States v. Herndon*, 156 F.3d 629, 636 (6th Cir. 1998). Here, Mikesell's alleged reference to her past or future relationship with the victim's families conveyed to the jurors no information about the facts of the case or the credibility of the witnesses who testified. That reference therefore did not convey "extraneous prejudicial information" to the jury.

A closer question is whether Mikesell's alleged past (Freeman's version) or future (Wobler's version) relationship with the victims' families was "an outside influence [that] was improperly brought to bear on any juror[.]" Fed. R. Evid. 606(b)(2)(B). An outside influence is an "external influence" upon the jury, rather than an "internal" one. *Tanner*, 483 U.S. at 117. This distinction too is more illustrated than defined in the caselaw. Examples of external influence include the bribe offer in *Remmer*; a bailiff's statement to jurors that the defendant was "wicked" and "guilty[,]" *see Parker v. Gladden*, 385 U.S. 363, 365 (1966); the mid-trial pendency of a juror's employment application with the district attorney's office that was trying

the case, *see Smith v. Phillips*, 455 U.S. 209, 212 (1982); and "'a threat to the safety of a member of [a juror's] family,'" *see Tanner*, 483 U.S. at 123 (quoting H.R.Rep. No. 93-650, pp. 9-10 (1973)). Examples of influences deemed internal include a juror's intoxication during trial, *Tanner*, 483 U.S. at 125; and a juror's "own subjective fear" that he might encounter the defendant's family after trial. *Garcia v. Andrews*, 488 F.3d 370, 376 (6th Cir. 2007).

The distinction between external and internal influences is elusive because even internal influences ultimately arise from some external cause. (No influence upon a juror is *a priori*.) In *Garcia*, for example, the juror's fear was "based on the fact that he worked in the area where the Garcia family owned property and that he was 'in the same business'" that they were in. *Id*. That professional and geographic immediacy was external to the juror's own mental processes, but the "subjective fear" that resulted—and thus the "influence" arising from that fear—was internal. Yet in *Phillips* the pending job application—which the juror himself submitted, and whose effect on the juror might have been no different than the "subjective fear" in *Garcia*—was apparently an external influence.

All these cases involve a chain of causation between external events and an influence that is ultimately felt as internal. Perhaps the best way to understand these distinctions, then, is by reference to whether the influence's *proximate cause* is internal or external to the juror's mental processes. Suppose a juror's spouse threatens to divorce him if he does not vote to convict in the case in which he sits. Any resultant influence on that juror would flow from the threat itself, "in a natural and continuous sequence, unbroken by any efficient intervening cause[.]" *Black's Law Dictionary* 1125 (6th ed. 1990) (defining "proximate cause"). Hence the threat would be an external influence. But suppose the juror instead merely believes that his spouse very much wants him to vote to convict. A prejudicial influence resulting from that belief would flow more from the intervening cause of juror's own subjective fears than from his spouse's body language. Hence that influence, like the one in *Garcia*, would be internal. *Phillips* might be a closer case; but there the Court apparently thought that the influence upon the applicant juror flowed more naturally and continuously from the pending application than from his antecedent decision to submit it. (No application, no influence.) By contrast, in *Garcia*, the juror's fear did not flow naturally and continuously from the what the juror called the "propensity for contact" with the

defendant's family; instead that fear was "subjective," which is to say its primary cause was internal.

In any event, I think that any influence from Mikesell's alleged relationship with the victim's families was likewise internal. In our last decision in Cunningham's case, more than seven years ago, our court defined "the real question raised by this claim" as follows: "did Mikesell have a relationship with the families of the victims, and if so, was she improperly biased or influenced by that relationship and her knowledge that she would have to face them and work in the community after the trial was over?" *Cunningham v. Hudson*, 756 F.3d 477, 486 (6th Cir. 2014). Any "fear" that Mikesell had of facing the victim's families after an acquittal was just as "subjective" as the *Garcia* juror's fear of facing the defendant's family after a conviction. For in neither case did the families take any discrete action to cause the alleged fear. In both cases, rather, the fear was subjective, arising primarily from the juror's own mental processes—in Mikesell's case (assuming the fear existed at all) from her own self-imposed moral pressure.

The "influence" of which Cunningham complains now was therefore internal. Thus, the jurors' testimony about that alleged influence did not fall within any exception in Rule 606(b)(2), which means that Rule 606(b)(1) barred the district court from receiving that testimony. The district court therefore was not required to hold a hearing on the basis of that testimony. *See Tanner*, 483 U.S. at 126-27. (On this point the majority's reliance on *Williams* is likewise misplaced: the evidence that supported a hearing in that case had nothing to do with jury deliberations. *See* 529 U.S. at 441-43.)

It bears mention that the omission of any open-ended exception in Rule 606(b)(2) for testimony about "potential juror bias" was deliberate. The rule's exceptions, as shown above, are more narrow and discrete. And Rule 606(b)(1)'s limitations, the Supreme Court has repeatedly emphasized, operate alongside "existing, significant safeguards for the defendant's right to an impartial and competent jury beyond post-trial juror testimony[.]" *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 866 (2017). Specifically, "*voir dire* provides an opportunity for the court and counsel to examine members of the venire for impartiality. As a trial proceeds, the court, counsel, and court personnel have some opportunity to learn of any juror misconduct.

And, before the verdict, jurors themselves can report misconduct to the court." *Id.* But testimony about jury deliberations cannot serve as a back-end substitute for voir dire. "It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Phillips*, 455 U.S. at 217. And it is far from clear "that the jury system could survive such efforts to perfect it." *Tanner*, 483 U.S. at 120. For all these reasons, the majority errs in ordering a hearing on this claim.

C.

Finally, I concur in the judgment as to the majority's denial of relief on Cunningham's remaining claims. I disagree, however, with the majority's dictum that counsel's "subpar performance at the penalty phase flouted the Constitution." Op. at 29. The majority does not dispute the adequacy of counsel's investigation, asserting instead that counsel should have presented more details from the records of Allen Children's Services. As the Ohio courts determined, however, the evidence that Cunningham (and now the majority) cites "largely duplicated the mitigation evidence at trial." *Cullen v. Pinholster*, 563 U.S. 170, 200 (2011). And those records "would barely have altered the sentencing profile presented[.]" *Strickland v. Washington*, 466 U.S. 668, 700 (1984).

I concur in the judgment in part and respectfully dissent in part.